# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEE VARDAKAS, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>AMERICAN DG ENERGY INC., JOHN N. HATSOPOULOS, GEORGE N. HATSOPOULOS, BENJAMIN LOCKE, CHARLES T. MAXWELL, DEANNE M. PETERSEN, CHRISTINE M. KLASKIN, JOHN ROWE, JOAN GIACINTI, ELIAS SAMARAS, TECOGEN INC., TECOGEN.ADGE ACQUISITION CORP., and CASSEL SALPETER & CO., LLC, )<br><br>Defendants. ) | Case No. 17 cv 10247 - MPK<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff, William Chase May ("Lead Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Lead Plaintiff on behalf of himself and on behalf of other similarly situated former holders of the common stock of American DG Energy Inc. ("ADGE" or the "Company"), in connection with the (now consummated) merger transaction announced on November 2, 2016 (the "Merger"), pursuant to which each share of ADGE common stock was acquired by Tecogen Inc. ("Tecogen") in exchange for 0.092 shares of Tecogen common stock (the "Exchange Ratio").

2.     As set forth in the companies' Agreement and Plan of Merger dated November 1,

2016, and Amendment No. 1 thereto dated March 23, 2017 (collectively, the "Merger Agreement"), upon the consummation of the Merger, a wholly owned subsidiary of Tecogen, Tecogen.ADGE Acquisition Corp. Inc. ("Merger Sub"), merged with and into ADGE, with ADGE continuing as the surviving corporation and as a wholly owned subsidiary of Tecogen.

3.      The Merger was subject to numerous conflicts of interest.  ADGE and Tecogen were both controlled by their co-founders, John Hatsopoulos and his brother, George Hatsopoulos (sometimes referred to herein as the "Hatsopoulos brothers"), who stood on both sides of the Merger transaction and controlled the boards of directors of each company.  The two companies were also extremely closely related entities that: shared certain members of their boards of directors and senior management, including Co-CEOs; maintained the same physical office space, which ADGE leased from Tecogen; and ran complementary and co-dependent businesses.

4.      The Hatsopoulos brothers were powerful insiders in both companies for many years.  John Hatsopoulos was the Co-CEO of ADGE and Tecogen and served as a director of each since the early 2000s.  George Hatsopoulos was the former Chairman of the ADGE Board of Directors ("Board") and a former director of Tecogen, which were roles he held for over a decade. He was also a technical advisor to ADGE when the Merger was announced.

5.      At the time of the Merger, the Hatsopoulos brothers, together with their families, beneficially owned or controlled, or were the beneficiaries of trusts that owned or controlled, more than 34% of ADGE common stock and more than 23% of Tecogen common stock.  The relative market values of the Hatospoulos brothers' and their families' collective holdings in ADGE and Tecogen common stock were approximately $5.6 million for ADGE and $17.9 million for Tecogen.  Thus, the Hatsopoulos brothers had a huge financial incentive to protect the value of their Tecogen shares in the Merger, even at the expense of the value of their ADGE shares.

6.     According to the companies' annual filings with the Securities and Exchange Commission ("SEC"), because of the Hatsopoulos brothers' large shareholdings of each company, they (along with other large shareholders) had "the ability to control various corporate decisions," including "the election of directors" and "the outcome of any other matter requiring shareholder approval, including a merger."  Thus, the other board members were beholden to them for their board positions and could not act independently.

7.     Because the Hatsopoulos brothers controlled both ADGE and Tecogen, and stood on both sides of the Merger, the Merger transaction is subject to entire fairness review.  This requires Defendants to establish that the Merger was the product of both fair dealing and resulted in a fair price.  As set forth herein, Defendants cannot establish either, because the Merger is the product of a conflicted sales process that resulted in an inadequate Exchange Ratio.

8.     Specifically, aside from the inherent conflicts of interest caused by the Hatsopoulos brothers' control over both companies and their boards of directors, John Hatsopoulos took a major role in the Merger negotiations, tainting the entire process.  John Hatsopoulos began negotiating the Merger with his Co-CEO, Benjamin Locke, months before any merger discussions were brought to the attentions of the companies' boards of directors.  Moreover, although the boards of directors of both companies ultimately learned of these discussions and created special committees of "independent" directors to continue Merger negotiations—purportedly to isolate the conflicted individuals from the process—John Hatsopoulos and Benjamin Locke were allowed to attend the special committees' meetings.

9.     In addition, John Hatsopoulos was the Chairman of the board of directors, and a significant stockholder, of ADGE's subsidiary, EuroSite Power Inc. ("EuroSite Power").  Other members of ADGE's Board were also directors, officers and/or beneficial owners of EuroSite

Power.  In a self-dealing transaction negotiated concurrently with the Merger, John Hatsopoulos caused ADGE to sell him valuable assets, in the form of EuroSite Power common stock, at a huge discount to their market value.

10.     As a result of the tainted sales process, ADGE's special committee (the "Special Committee") and its financial advisor, Cassel Salpeter & Co., LLC ("Cassel Salpeter"), failed to shop ADGE to any potential acquirors other than Tecogen and did not run a competitive auction or market check.  They also failed to even attempt to make the approval of the Merger subject to a "majority-of-the-unaffiliated stockholders" provision, and agreed to an inadequate Exchange Ratio that undervalued ADGE and denied its unaffiliated stockholders fair value for their ADGE shares.

11.     The Exchange Ratio at which ADGE shares will be exchanged for Tecogen shares is also inadequate.  It was calculated based on the $4.02 closing price of Tecogen common stock on May 18, 2017 (the day the Merger became "effective"), but is worth only $0.37 in Tecogen common stock for each share of ADGE common stock, which is significantly below the Company's 52-week trading high at the time of the announcement of the Merger, of $0.52.

12.     The Exchange Ratio was also at the very bottom of the implied exchange ratio range calculated by Tecogen's financial advisor (0.092-0.1235), such that ADGE shareholders should have received much more consideration for their shares.  Simply put, the Exchange Ratio was insufficient and undervalued the Company.

13.     Nevertheless, the Board, in breach of its fiduciary duties, attempted to justify the fairness of the inadequate Exchange Ratio by falsely representing that ADGE could not continue to operate as a stand-alone entity absent the consummation of the Merger.

14.     Furthermore, upon the closing of the Merger, Tecogen shareholders were expected

to own approximately 81% of the combined company, while ADGE shareholders were only expected to beneficially own approximately 19% of the combined company. Yet ADGE contributed over 45% of the assets and 54% of the shareholders' equity in the Merger. Lead Plaintiff and the Class therefore had their equity stake and voting power severely and unfairly diluted in the Merger.

15. In addition, in order to convince ADGE's unaffiliated shareholders to vote in favor of the Merger, Defendants authorized the dissemination of a materially incomplete and misleading Form S-4 Registration Statement filed with the SEC on December 21, 2016, which contained a joint proxy statement/prospectus. These documents were amended several times between the S-4's initial filing and the May 18, 2017 Merger vote. ADGE filed the final joint proxy statement/prospectus concerning the Merger on Form DEF 14A on April 28, 2017. (Unless otherwise specified herein, all specific references to the "Proxy" refer to the final joint proxy statement/prospectus, with general references collectively referring to all prior versions of the S-4 and the joint proxy statement/prospectus.)

16. The Proxy recommended that ADGE shareholders vote in favor of the Merger, but it omitted material information that rendered certain statements therein materially incomplete and misleading. In particular, the Proxy contained materially incomplete and misleading information concerning, *inter alia*: the valuation analyses performed by ADGE's and Tecogen's respective financial advisors in support of their so-called "fairness opinions" that approved of the Exchange Ratio, and the flawed sales process leading to the Merger.

17. As described more fully below, Defendants breached their fiduciary duties in connection with the Merger, and/or aided and abetted those breaches. Defendants also violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 ("Rule 14a-9") promulgated thereunder, in connection with the dissemination of the materially incomplete and misleading Proxy.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction), as Lead Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

19.     This Court has supplemental jurisdiction over Lead Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as such claims relate to Lead Plaintiff's federal claims and form part of the same case or controversy under Article III of the United States Constitution.

20.     This Court also has jurisdiction over Lead Plaintiff's state law claims pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Lead Plaintiff and each named Defendant, and the amount in controversy is satisfied.

21.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual or entity who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) ADGE and Tecogen maintain their primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial

compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

23.     Lead Plaintiff was a shareholder of ADGE at all relevant times, and is a citizen of Louisiana.

24.     Defendant ADGE is a Delaware corporation that maintains its principal executive offices at 45 First Avenue, Waltham, Massachusetts.  The Company distributes and operates on-site cogeneration systems that produce both electricity and heat.  The Company also distributes and operates natural gas powered cooling systems.

25.     Defendant Tecogen is a Delaware corporation that maintains its principal executive offices at 45 First Avenue, Waltham, Massachusetts.  Tecogen designs, manufactures and sells industrial and commercial cogeneration systems.

26.     Defendant Merger Sub is a Delaware corporation and a wholly owned subsidiary of Tecogen.  Merger Sub was established for purposes of effectuating the Merger.

27.     Defendant John N. Hatsopoulos ("John Hatsopoulos") is a citizen of Massachusetts. John Hatsopoulos was the co-founder and Co-CEO of both ADGE and Tecogen, and thus stood on both sides of the Merger.  He served as a director of ADGE since 2001, has been a director of Tecogen since 2000, and served as the chairman of the board of ADGE's subsidiary, EuroSite Power, until resigning on May 16, 2016.  As described herein, John Hatsopoulos and his brother, George Hatsopoulos, were the *de facto* controllers of ADGE and Tecogen.

28.     Defendant Benjamin Locke ("Locke") is a citizen of Massachusetts.  Locke is Co-CEO of ADGE and Tecogen.  Prior to joining ADGE, Mr. Locke served as the General Manager for Tecogen.

29.     Defendant Charles T. Maxwell ("Maxwell") is a citizen of New York.  Maxwell was the Chairman of the ADGE Board since April 2, 2012, a member of the Audit, Compensation, and Nominating and Governance committees of the Board, and served as a director since 2001. He has also been a member of the board of directors of Tecogen since 2001.

30.     Defendant Deanna M. Petersen ("Petersen") is a citizen of Massachusetts.  Petersen was a member of the Audit, Compensation, and Nominating and Governance committees of the Board and served as a director of the Company since 2010.  Defendant Petersen was also a member of the Special Committee that was formed to advise the Board during the Merger negotiations with Tecogen.

31.     Defendant Christine Klaskin ("Klaskin") is a citizen of Massachusetts.  Klaskin was a member of the Audit committee of the Board and served as a director of the Company since 2012.  Defendant Klaskin was also a member of the Special Committee.

32.     Defendant John Rowe ("Rowe") is a citizen of Illinois.  Rowe served as a director of the Company since 2013.  Defendant Rowe was also a member of the Special Committee.

33.     Defendant Joan Giacinti ("Giacinti") is, upon information and belief, a citizen of France.  Giacinti served as a director of the Company since 2013.  Giacinti is also a director of EuroSite Power.

34.     Defendant Elias Samaras ("Samaras") is a citizen of Massachusetts.  Samaras served as a director of the Company since 2015.  He is also the CEO of EuroSite Power.  Samaras was nominated to the Board by John Hatsopoulos and was identified through his former business relationship with George Hatsopoulos.

35.     Defendants identified in paragraphs 28-35 are collectively referred to herein as the "Director/Officer Defendants."

36.     Defendant George N. Hatsopoulos ("George Hatsopoulos") is a citizen Massachusetts.  George Hatsopoulos was the Chairman of the ADGE Board from the organization of the Company in July 2001 until April 2, 2012, and was a technical advisor to the Company at the time of the Merger.  He was a director of Tecogen from 2000 through June 27, 2014.  As discussed herein, George Hatsopoulos, together with his brother John Hatsopoulos, constituted a control group that controlled all significant affairs and decisions of the Company.

37.     Non-party Robert Panora is the President and Chief Operation Officer of Tecogen and was the General Manager of ADGE.

38.     Non-party Bonnie Brown was the Chief Financial Officer of ADGE prior to the Merger.  She is also the CFO, treasurer and secretary of EuroSite Power.  Prior to joining ADGE, Ms. Brown served as the CFO for Tecogen.  After the Merger, Ms. Brown again became the CFO of Tecogen.

39.     Non-party Cassel Salpeter is a Florida limited liability company headquartered in Miami, Florida.  Cassel Salpeter provides companies with a broad spectrum of investment banking and financial advisory services.

## CLASS ACTION ALLEGATIONS

40.     Lead Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public shareholders of ADGE (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

41.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of April 24, 2017, there were approximately 50,684,095 shares of ADGE common stock

outstanding, beneficially owned by hundreds or thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of ADGE will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants misrepresented or omitted material information concerning the Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Director/Officer Defendants violated Section 20(a) of the Exchange Act;

iii)    whether the Director/Officer Defendants breached their fiduciary duties as officers and directors of the Company in connection with the Merger;

iv)     whether Defendants John Hatsopoulos and George Hatsopoulos breached their fiduciary duties in their capacity as controlling shareholders of ADGE;

v)      whether George Hatsopoulos, Tecogen, and Merger Sub aided and abetted the Director/Officer Defendants' breaches of fiduciary duty; and

vi)     whether Lead Plaintiff and other members of the Class suffered damages as a result of the consummation of the Merger.

c.      Lead Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Lead Plaintiff's claims are typical of the claims of the other members of the Class and Lead Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class; and

f.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## THE DIRECTOR/OFFICER DEFENDANTS' FIDUCIARY DUTIES

42.    By reason of the Director/Officer Defendants' positions as directors and/or officers of ADGE, they were in a fiduciary relationship with Lead Plaintiff and the other public shareholders of ADGE and owed Lead Plaintiff and the other members of the Class the duties of care, loyalty, good faith and candor.

43.    By virtue of their positions as directors and/or officers of ADGE, the Director/Officer Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause ADGE to engage in the practices complained of herein.

44.    Each of the Director/Officer Defendants was required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably necessary to maximize the value shareholders will receive or obtain a reasonable premium.  To diligently comply with this duty, the directors of a corporation may not take any action that:

a.    adversely affects the value provided to the corporation's shareholders;

b.    contractually prohibits them from complying with or carrying out their fiduciary duties;

c.    discourages or inhibits alternative offers to purchase control of the corporation or its assets;

d.    will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

11

e.  will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

45.  Lead Plaintiff alleges herein that the Director/Officer Defendants, separately and together, in connection with the Merger, violated duties owed to Lead Plaintiff and the other public shareholders of ADGE, including their duties of loyalty, good faith, care and candor insofar as they, *inter alia*: failed to obtain fair value for the ADGE shareholders' shares before entering into the Merger Agreement; placed their own interests, and their loyalties to the Hatsopoulos brothers, ahead of the interests of, and loyalties owed to, ADGE and its shareholders; and caused a materially incomplete and misleading Proxy to be disseminated to the Company's shareholders.

46.  Further, John Hatsopoulos and George Hatsopoulos were the *de facto* controllers (or a control group) of both ADGE and Tecogen, by virtue of, *inter alia*: (i) they and their families' beneficial ownership, control, or status as beneficiaries of trusts that owned or controlled, more than 34% of ADGE and more than 23% of Tecogen; (ii) positions as officers, directors and/or advisors to ADGE and/or Tecogen; (iii) longstanding relationships with the other Director/Officer Defendants with the ability to control their election; and (iv) their position standing on both sides of the Merger transaction.  As such, John Hatsopoulos and George Hatsopoulos owed fiduciary duties of care, loyalty, good faith and candor to the Company's unaffiliated shareholders.  The Merger is, therefore, subject to the entire fairness standard of review.

## SUBSTANTIVE ALLEGATIONS

### I.    The Significant Ties Between ADGE and Tecogen

47.  Prior to the Merger, ADGE and Tecogen shared an extremely close relationship.  A recent SEC filing described ADGE and Tecogen as "affiliated companies by virtue of common ownership and common leadership."  According to an earlier version of the Proxy, these close

interconnections raised potential conflicts of interest that could have caused stockholders and regulators to "subject the transaction to additional scrutiny to ensure that there [were] no concerns of self-dealing or conflict of interest." (This language was removed from subsequent versions of the Proxy.)

48.    ADGE was incorporated in 2001 and is headquartered in Waltham, Massachusetts. The Company owns, operates, maintains, and distributes on-site energy systems that produce electricity, hot water, heat, and cooling energy at customers' facilities in the United States and the United Kingdom.  The Company installs its energy systems at customers' facilities, and sells the energy produced by these systems to customers on a long-term contractual basis.  It offers natural gas powered cogeneration systems, which produce electricity from an internal combustion engine driving a generator, while the heat from the engine and exhaust is recovered and used to produce heat and hot water for use at the site, as well as natural gas heat pumps and complementary energy equipment.  The Company also distributes and operates water chiller systems for building cooling applications.  It offers standardized packages of energy, equipment, and services to meet the needs of property owners and operators in healthcare, hospitality, residential, athletic facilities, and various industrial sites directly.

49.    Tecogen designs, manufactures, sells, and services energy systems for commercial installations and buildings and industrial processes.  Prior to the Merger, Tecogen was the primary supplier of cogeneration equipment and cogeneration maintenance services to ADGE.  Tecogen's revenue from sales of cogeneration parts and service to ADGE during the years ended December 31,   2015 and 2014 were $1,903,427 and $1,410,639,   respectively.    This represented 8.9% and 7.3% of Tecogen's total revenues in 2015 and 2014, respectively.  In 2016, the amount was $957,760.

50.     Prior to the Merger, ADGE and Tecogen shared the same offices, co-founders, and Co-CEOs; ran complementary and co-dependent businesses; shared certain members of senior management, directors, and ownership; and, critically and as discussed further below, were both controlled by the Hatsopoulos brothers, who co-founded ADGE and Tecogen and stood on both sides of the Merger.

## II.     John Hatsopoulos and George Hatsopoulos are Controlling Shareholders of ADGE and Tecogen and Stand on Both Sides of the Merger, Triggering Entire Fairness Review

51.     According to the Proxy, as of March 9, 2017, John and George Hatsopoulos, together with their families, beneficially owned or controlled, or were the beneficiaries of trusts that owned or controlled, more than 34% of ADGE common stock and more than 23% of Tecogen common stock.  John Hatsopoulos beneficially owned or controlled 514,546 shares of ADGE common stock, or approximately 1.02%, Proxy 143, and 3,265,118 shares of Tecogen common stock, or approximately 16.30%, Proxy 117.  A trust established for the benefit of John Hatsopoulos's children beneficially owned or controlled 10,196,847 shares of ADGE common stock, or approximately 20%.  Proxy 143.  George Hatsopoulos beneficially owned or controlled 6,648,796 shares of ADGE common stock, or approximately 13.12%, Proxy 143, and 1,355,541 shares of Tecogen common stock, or approximately 6.76%, Proxy 117.

52.     Based on the relative prices of the two companies as of March 9, 2017, the relative market values of the Hatsopoulos brothers' and their families' collective holdings in ADGE and Tecogen common stock were approximately $5.6 million for ADGE (17.4 million ADGE shares * the closing price of $0.32 per share), and $17.9 million for Tecogen (4.6 million Tecogen shares * the closing price of $3.88 per share).  The Hatsopoulos brothers therefore had a huge financial incentive to protect the value of their Tecogen shares in the Merger, even at the expense of the value of their ADGE shares.

53.     According to both ADGE's and Tecogen's 10-Ks at the time the Merger Agreement was signed and while the Merger negotiations between ADGE and Tecogen were taking place, the Hatsopoulos brothers' significant shareholdings in each company enabled them to "control various corporate decisions [of each company], including . . . the election of directors . . . and the outcome of any other matter requiring shareholder approval, including a merger."

54.     ADGE acknowledged that it was controlled by the Hatsopoulos brothers in its 10-K for fiscal year 2015, which was filed with the SEC on March 30, 2016, in which it stated:

> [ADGE is] controlled by a small group of majority stockholders, and our minority stockholders could be unable to effect changes in our governance structure or implement actions that require stockholder approval, such as a sale of the Company. *George N. Hatsopoulos and John Hatsopoulos*, who are brothers, together with their families, beneficially own a large portion of our outstanding shares of common stock.  These shareholders, with a small group of other major shareholders, *have the ability to control various corporate decisions, including* our direction and policies, *the election of directors*, the content of our charter and bylaws and *the outcome of any other matter requiring shareholder approval, including a merger*, consolidation and sale of substantially all of our assets or other change of control transaction.  The concurrence of our minority shareholders will not be required for any of these decisions.

(Bold emphasis on initial sentence removed; all other emphasis added.)  ADGE's 10-Ks for fiscal years 2007 through 2014 (i.e., all prior 10-Ks filed by ADGE) contained substantially similar statements.

55.     Similarly, Tecogen acknkwowledged that it was controlled by the Hatsopoulos brothers in its 10-K for fiscal year 2015, which was filed with the SEC on March 30, 2016, in which it stated:

> [Tecogen is] controlled by a small group of majority stockholders, and our minority stockholders will be unable to effect changes in our governance structure or implement actions that require stockholder approval, such as a sale of the Company. *George N. Hatsopoulos and John N. Hatsopoulos*, who are brothers, beneficially own approximately 39.4% of our outstanding shares of Common Stock. These stockholders *have the ability to control various corporate decisions, including* our direction and policies, *the election of directors*, the content of our charter and bylaws and *the outcome of any other matter requiring stockholder approval,*

> ***including a merger***, consolidation and sale of substantially all of our assets or other
> change of control transaction. The concurrence of our minority stockholders will
> not be required for any of these decisions.

(Bold emphasis on initial sentence removed; all other emphasis added.)  Tecogen's 10-Ks for fiscal

years 2012 through 2014 (i.e., all prior 10-Ks filed by Tecogen) contained substantially similar

statements.

56.     The Hatsopoulos brothers' control over the election of ADGE's directors made all

of the Director/Officer Defendants, including the three Director/Officer Defendants who served

on the Special Committee, beholden to them for their directorships.  The same is true with respect

to Tecogen's directors and the members of its special committee.  The special committees of both

companies therefore did not function as truly independent.

57.     Moreover, because the other Director/Officer Defendants beneficially owned or

controlled a significant portion of ADGE's common stock, the Hatsopoulos brothers' ability to

control or unduly influence their votes could have significantly impacted the results of the Merger,

which was subject to a bare-majority-approval vote.  As of March 9, 2017, ADGE's executive

officers and directors (other than the Hatsopoulos brothers) beneficially owned or controlled

4,586,367 shares of ADGE common stock, or approximately 9.05%.  Proxy 143.  According to

the Proxy: "These stockholders, if they acted together, could exert influence on matters requiring

approval by ADGE's stockholders, including the election of directors, the approval of mergers or

other business combination transactions, consolidation and sale of substantially all of ADGE's

assets or other change of control transaction.  This concentration of ownership may discourage or

prevent someone from acquiring ADGE's business."  Proxy 43.

58.     Tecogen's officers and directors (other than the Hatsopoulos brothers), beneficially

owned or controlled 730,846 shares of Tecogen common stock, or 3.65%.  Proxy 117.  Combining

this with the Hatsopoulos brothers' ownership, the Proxy states that, "in addition to their board

seats and offices, such persons will have influence over corporate actions requiring shareholder approval." Proxy 37.

59.     Further evidencing his influence and control over the Company, John Hatsopoulos has personally engaged in several financing transactions with ADGE and its affiliated entities. Some of these transactions, involving convertible debentures, are described in detail below. Others include a $3 million loan from John Hatsopoulos to EuroSite Power in September 2014, and an $850,000 loan through a revolving line of credit that John Hatsopoulos loaned ADGE after the Merger Agreement was executed, in December 2016. These transactions caused ADGE and its affiliated entities to remain beholden to John Hatsopoulos and were significant to ADGE, which "raised the majority of its funds through the issuance of convertible debentures, its subsidiaries convertible debentures, private placements and public offerings of its common stock." ADGE 10-K, filed with the SEC May 21, 2017.

60.     John Hatsopoulos has also used his power and control over ADGE and Tecogen to cause both companies to enter into overlapping contracts and business relationships. For example, on August 7, 2015, ADGE entered into a Facilities, Support Services and Business Agreement with Tecogen (the "Facilities Agreement"). The Facilities Agreement provided that, in exchange for agreed upon fees, Tecogen would provide ADGE with, among other things:  (1) 2,400 square feet of office space, which ADGE leased from Tecogen for $5,122 per month; (2) business support services; (3) rights to purchase cogeneration products and services directly from Tecogen at a discounted price; and (4) the right to certain royalty fees.

61.     In sum, John Hatsopoulos and George Hatsopoulos were controlling shareholders of both ADGE and Tecogen, who stood on both sides of the Merger transaction, and had the ability to force their will upon both companies' boards of directors in order to push through approval of

the Merger.  Because the Hatsopoulos brothers controlled both ADGE and Tecogen, the Merger is subject to entire fairness review.

### III.    The Conflicted and Unfair Sales Process

62.    The "Background of the Merger" section of the Proxy (pages 52-56) describes a conflicted sales process in which the only possible outcome was a sale of ADGE to Tecogen.

63.    The conflicted process began in January 2016, when John Hatsopoulos and Benjamin Locke—the Co-CEOs of both ADGE and Tecogen—began having "informal meetings" to discuss a potential merger transaction between their two companies.  These meetings took place outside the presence of, and without being disclosed to, either company's board of directors.  Representatives of Sullivan & Worcester ("S&W"), outside counsel for both companies, also became involved in these "informal" meetings, and recommended a process by which the potential merger transaction would take place.  The Proxy does not disclose the number of these meetings that took place during this time.

64.    Also beginning in January 2016 and continuing for several months, the management teams of both companies, including the CFOs of each, Bonnie Brown (of ADGE) and David Garrison (of Tecogen), held their own "informal meetings"—also outside of the presence of, and without being disclosed to, either company's board of directors—to discuss "the companies' respective businesses, the potential benefits of a combination, and the proposed transaction generally."  The Proxy does not disclose the number of these meetings that took place during this time.

65.    On March 15 2016, John Hatsopoulos and Locke decided to inform the boards of directors of ADGE and Tecogen about the months of merger discussions that had taken place outside of their knowledge.  This caused the boards of both companies to immediately create—on the same day they were told about the prior discussions—special committees of so-called

"independent directors" that did not include Mr. Hatsopoulos or Mr. Locke to negotiate the Merger. The ADGE special committee (previously defined as the "Special Committee") was comprised of "independent" directors Deanna Peterson, John Rowe, and Christine Klaskin. (Ms. Klaskin was added weeks after the Special Committee was formed for reasons not disclosed in the Proxy.)

66. Although the Special Committee was supposed to act independently of the other Board members, and especially of Mr. Hatsopoulos, it was inherently incapable of doing so. As discussed above, because the Hatsopoulos brothers "control[led] . . . the election of [ADGE] directors," including the Special Committee members, the notion that the Special Committee could act "independently" is questionable, at best. Moreover, the Special Committee did not even attempt to give the appearance of acting independently, as it allowed Mr. Hatsopoulos and S&W to participate in various Special Committee meetings. Mr. Hatsopoulos, Mr. Locke, and S&W also participated in various meetings of Tecogen's special committee.

67. As a result of these conflicted Merger negotiations, ADGE and its unaffiliated stockholders were adversely affected. For example, as detailed below, the Exchange Ratio negotiated and agreed to by the Special Committee was inadequate and failed to fairly compensate ADGE shareholders for the value of their shares.

68. In addition, at no point during the sales process did the Special Committee or its legal or financial advisors explore alternative strategic options for ADGE other than a merger with Tecogen, including a merger with another potential acquiror or remaining a stand-alone entity. According to the Proxy, "ADGE did not run a competitive auction" and the Special Committee's financial advisor, "Cassel Salpeter[,] was not authorized to, and did not, solicit indications of interest from third parties regarding a potential transaction involving ADGE." Proxy 61, 67.

Indeed, the Special Committee was solely authorized to "evaluate a merger **with Tecogen**," and was not authorized to solicit or pursue alternative transactions with other parties.  Proxy 52.

69.     The Special Committee and other Board members also failed to fulfill their fiduciary duties to ensure that the Merger was fair to ADGE's unaffiliated stockholders by not even attempting to negotiate conditioning the approval of the Merger upon the vote of a "majority of the unaffiliated stockholders" of ADGE.  This was particularly important, as the Proxy stated that, "[a]lthough there are no voting agreements of any Tecogen or ADGE stockholders to vote for the Merger, given the large insider holdings of both companies, it is believed there is a high likelihood of completion of the transaction."  Proxy 58.

70.     The Special Committee and other Board members also failed to protect ADGE's unaffiliated stockholders by not negotiating for a "collar provision" in the Merger Agreement, which would have protected ADGE stockholders from losing some of the value of the already inadequate Merger consideration in the event Tecogen's stock price decreased prior to the consummation of the Merger.

71.     In sum, the Director/Officer Defendants ran a flawed sales process that was controlled by John Hatsopoulos, who stood on both sides of the Merger negotiations, and in which the Special Committee failed to conduct a sufficient and robust review of strategic alternatives and quickly rubber-stamped a deal with Tecogen.

## IV.     The Convertible Debt Transactions

72.     In July 2010, ADGE established EuroSite Power as a subsidiary to introduce ADGE's energy products into the European market.  There were significant overlaps between the ownership and management of ADGE and EuroSite Power, just as there were between those of ADGE and Tecogen.  For example, as of April 27, 2016, ADGE beneficially owned 48% of EuroSite Power's common stock, and John Hatsopoulos beneficially owned 4.8% of EuroSite

Power's common stock.  John Hatsopoulos also served as the Chairman of the board of directors of EuroSite Power since the organization of the company in July 2010 until he resigned on May 16, 2016.  As a controlling shareholder of ADGE, John Hatsopoulos controlled its subsidiary.

73.    Moreover, Director/Officer Defendant Samaras has served as the CEO of EuroSite Power since June 2015, as a board member since September 2015, and beneficially owned 5.3% of EuroSite Power's common stock as of April 27, 2016.  Director/Officer Defendant Giacinti has served as a director of EuroSite Power since 2012, and beneficially owned 2.5% of EuroSite Power's common stock as of April 27, 2016.  Also, Bonnie Brown, the former CFO of ADGE and current CFO of Tecogen, has been the CFO of EuroSite Power since September 2015.

74.    Through his control over ADGE, Tecogen, and EuroSite Power, John Hatsopoulos caused the companies to engage in a series of transactions, culminating in the Merger, in which he greatly benefitted at the expense of ADGE and its unaffiliated stockholders.  As described immediately below, in one set of complex transactions that took place concurrently with the Merger, John Hatsopoulos caused ADGE to sell to himself and two significant debt-holders of ADGE, valuable assets (i.e., ADGE's shares of EuroSite Power) for a fraction of their market value.

75.    On May 23, 2011, ADGE issued $12.5 million of convertible debentures, $2.4 million of which were issued to John Hatsopoulos, and the remainder of which were issued to Tryfon and Despina Pantopoulou Natsis ("Mr. and Mrs. Natsis").  As of March 9, 2017, Mr. and Mrs. Natsis were the beneficial holders of 8.07% of Tecogen common stock.  Proxy 117.  Mr. and Mrs. Natsis were also former large ADGE shareholders, owning as much as 11.2% of the Company's stock as of October 7, 2016 and 3.2% as of January 30, 2017.  On November 30, 2011, ADGE issued an additional $6.9 million of convertible debentures to Mr. and Mrs. Natsis, bringing

the total issued convertible debentures to $19.4 million (the "Convertible Debt").  This amount remained outstanding until early 2016.

76.     As discussed above, on March 15, 2016, ADGE's Board formed the Special Committee, which was empowered to "take all actions necessary to evaluate a merger with Tecogen."  Proxy 52.  For the first month immediately following its formation, before it had retained its financial advisor or discussed any terms of the Merger with Tecogen, the Special Committee spent an inordinate amount of time arranging transactions to repay and extinguish the Convertible Debt (the "Convertible Debt Transactions").  Proxy 52-53.  The Proxy does not explain why the Special Committee was responsible for arranging such a transaction, or what, if anything, it had to do with negotiating the Merger with Tecogen.

77.     Specifically, less than a week after its formation, on March 21, 2016, the Special Committee met to discuss "a potential transaction that would eliminate the ADGE convertible debt."  *Id*. at 52.  On April 1, 2016, the Special Committee met "to further discuss a convertible debt transaction."  *Id*. at 53.  On April 5, 2016, the Special Committee met to discuss "the proposed convertible debt transaction," although the Proxy fails to disclose when a specific transaction had been "proposed," or by whom.  *Id*.  On April 8, 2016, the Special Committee met to discuss "the ADGE debt transaction."  *Id*.  Finally, on April 25, 2016, the Board, including John Hatsopoulos, "met and discussed the ADGE Special Committee's activities" and then "approved a transaction in which the outstanding convertible debt would be exchanged for shares of [ADGE's] subsidiary, EuroSite Power."  *Id*.

78.     The Convertible Debt Transactions began on May 4, 2016, when ADGE and the holders of the Convertible Debt, John Hatsopoulos and Mr. and Mrs. Natsis, executed a convertible note exchange agreement, pursuant to which the Convertible Debt holders exchanged

approximately $9.3 million of the outstanding Convertible Debt for 14.72 million of ADGE's EuroSite Power shares. *See* ADGE 8-K filed May 10, 2016 and ADGE 10-Q filed August 11, 2016. Critically, the exchange price used to calculate the number of EuroSite Power shares was $0.575, *id.*, yet the market price per share of EuroSite Power on the date the agreement was announced was significantly higher, at $0.75 per share. (The intrinsic value of the EuroSite Power shares may have been even higher than the market price indicated, as the stock traded infrequently and at low volume. Surely, if anyone would have known their true value it would have been John Hatsopoulos.) In this manner, John Hatsopoulos and Mr. and Mrs. Natsis acquired millions of EuroSite Power shares at a significant discount to market value.

79.     On September 30, 2016, ADGE and Mr. and Mrs. Natsis closed a convertible note exchange agreement (executed on August 9, 2016), pursuant to which Mr. and Mrs. Natsis exchanged approximately $4.3 million of the outstanding Convertible Debt for 9.7 million of ADGE's EuroSite Power shares. *See* ADGE 8-K filed October 5, 2016. The exchange price used to calculate the number of EuroSite Power shares (which was determined on the execution date, August 9, 2016) was $0.40 per share, *id.*, yet the market price per share of EuroSite Power on that date was $0.80 per share. (The remaining convertible debt owned by Mr. and Mrs. Natsis was extinguished for cash payments in other transactions.) Thus, again through this transaction, Mr. and Mrs. Natsis acquired millions more shares of EuroSite Power at a significant discount to market value.

80.     The Convertible Debt Transactions were an incredible deal for the Convertible Debt holders, but a terrible deal for ADGE and its unaffiliated shareholders. Not only did the Convertible Debt Transactions serve to repay all, or a portion, of the debt owed to John Hatsopoulos and Mr. and Mrs. Natsis, but they did so by providing the Convertible Debt holders

Case 1:17-cv-10247-LTS   Document 34   Filed 06/19/17   Page 24 of 45

with valuable assets (i.e., ADGE's common stock holdings of EuroSite Power) worth significantly more than the market value of the debt for which they were exchanged.

81.     In the case of John Hatsopoulos, the Convertible Debt Transactions were a classic example of self-dealing, in which a corporate insider who controls the company causes it to sell its assets to the insider for a fraction of their true value, in breach of the fiduciary duties owed to the company's shareholders by the insider and the company's board of directors approving the transaction.  This potentially exposed John Hatsopoulos and the Board to derivative liability.  However, such derivative liability was likely extinguished through the Merger, which John Hatsopoulos (and the Board) also controlled.

82.     In the case of Mr. and Mrs. Natsis, at the time the Convertible Debt Transactions took place, ADGE and Tecogen were in the midst of Merger negotiations, and Mr. and Mrs. Natsis were large shareholders of each company, and remained large shareholders of Tecogen through the Merger vote.  Thus, through the Convertible Debt Transactions, John Hatsopoulos was able to provide Mr. and Mrs. Natsis with a benefit not shared by ADGE's other shareholders in a transaction negotiated concurrently with the Merger – likely affecting their Merger votes.

## V.     The Unfair Exchange Ratio Was the Result of a Conflicted Sales Process and Failed to Adequately Compensate Lead Plaintiff and the Class for Their Shares

83.     The Exchange Ratio failed to adequately compensate ADGE shareholders for their shares.  Based on the $4.02 closing price of Tecogen common stock on May 18, 2017 (the day the Merger became "effective"), ADGE shareholders were given the equivalent of approximately $0.37 per share, which was significantly below the Company's 52-week trading high at the time of the announcement of the Merger, of $0.52.

84.     The Exchange Ratio also failed to compensate ADGE shareholders for ADGE's relative percentage contributions of total assets and total stockholders' equity to the post-Merger

entity.  Although ADGE's total assets and total stockholders' equity represented 45% and 54%, respectively, of the combined assets and stockholders' equity of ADGE and Tecogen as of the date of the Merger announcement, ADGE's stockholders received only 19% of the equity ownership and voting rights of the combined, post-Merger entity.  Aside from losing valuable equity consideration, there were significant consequences to ADGE's stockholders of obtaining such an unfairly low ownership percentage and voting interest in the post-Merger entity, including "exercis[ing] less influence over [the] management . . . and policies" of the post-Merger entity than they should have.  *See* Proxy 32.

85.     The Exchange Ratio was also at the very bottom of the implied exchange ratio range calculated by Tecogen's financial advisor, Scarsdale Equities LLC ("Scarsdale"), in connection with its Discounted Cash Flow ("DCF") Analysis (0.092-0.1235), which shows ADGE shareholders should be receiving much more in consideration for their shares.  Proxy 65.  That same analysis shows ADGE's shares are worth as much as $0.51 per share, much higher than the $0.37 per share that ADGE's shareholders received in the Merger and ***not even within Scarsdale's range of implied equity values for ADGE's shares ($0.38-$0.51 per share)***.

86.     On top of the problem that the value provided to ADGE shareholders was lower than the range calculated by Scarsdale, Scarsdale used some assumptions in its valuation that were significantly more conservative than ADGE's financial advisor.   The disparity between Scarsdale's range of implied exchange ratios and the Exchange Ratio likely could have been greater.   Scarsdale applied a much higher range of discount rates to ADGE's cash flows and terminal values (15.5% to 17.0%) than did ADGE's financial advisor, Cassel Salpeter (10.7% to 11.7%).  Proxy 65, 69.  Scarsdale also failed to perform a DCF analysis on Tecogen.

87.     ADGE's financial advisor, Cassel Salpeter, also undervalued the Company when it conducted its DCF Analysis by failing to account for the value of the "synergies expected to result from the Merger," which Scarsdale did consider in deriving its much higher valuation for ADGE. Proxy 62, 65.

88.     Cassel Salpeter also undervalued ADGE by applying unreasonably low multiples in its Selected Companies Analysis.  Although Cassel Salpeter calculated mean and median Enterprise Value ("EV") to Last Twelve Month ("LTM") Revenue Multiples of 5.69x and 6.42x, respectively, Cassel Salpeter applied *significantly lower* multiples of 2.50x to 3.00x to ADGE's LTM Revenue.  Proxy 70.  Had Cassel Salpeter used even the lower mean multiple for the selected companies, for example, the resulting implied enterprise value for ADGE would have been about $38 million, which is more than double the high point of the implied enterprise value range in the Proxy, of $18.9 million.  *Id.*  Cassel Salpeter did the same thing with respect to the EV/2016 and EV/2017 Revenue multiples, where it applied significantly lower multiples than the mean and median multiples it calculated for the selected companies.  *Id.*

89.     Making matters worse, Cassel Salpeter used unfavorable comparable companies in its Selected Companies Analysis, which drove down the mean and median multiples of the selected companies, even before Cassel Salpeter chose to apply significantly lower multiples to ADGE. For example, Cassel Salpeter included in its analysis Maxim Power Corp., a Canadian company that had been divesting a significant amount of its assets since 2014 and was in the process of changing its business model, such that its revenues had plummeted from $142.9 million in 2014 to $19.6 million in 2015.

90.     Moreover, the *most* comparable company that Cassel Salpeter used in its Selected Companies Analysis was EuroSite Power, a subsidiary of ADGE in the same business as ADGE.

Proxy 70. And EuroSite Power's EV to LTM Revenue multiple was approximately 12.5x, *significantly higher* than the 5.7x mean and the 6.4x median of the group of selected companies.

91.     ADGE was in a much stronger financial position than reflected by Cassel Salpeter's or Scarsdale's valuations. In the recent quarters leading up to the signing of the Merger Agreement, the Company's financial results had been slowly improving, and the Exchange Ratio failed to adequately compensate ADGE shareholders in light of these developments. For example, through the first three quarters ending September 30, 2016, although the Company's revenues fell by approximately 9% year-over-year, ADGE was able to: i) materially reduce its loss from operations as a result of its concerted effort to reduce expenses, and ii) dramatically improve its Adjusted EBITDA. Specifically, between the first three quarters of 2015 and the first three quarters of 2016, ADGE's cost of sales decreased by approximately $300,000 and operating expenses were reduced by approximately $850,000. Over the same periods, ADGE's Adjusted EBITDA improved from negative $364,404 to positive $326,713, an overall improvement of approximately $691,000. The year-over-year improvement in Adjusted EBITDA continued into the fourth quarter of 2016 and the first quarter of 2017.

92.     The Exchange Ratio is also inadequate in light of strategic steps ADGE took to reduce its debt in the months preceding the announcement of the Merger. The Company attempted to justify the Merger at the inadequate Exchange Ratio by suggesting that it was necessary to deal with its "overhang of its debt obligations for borrowed money" that it would be "unable to repay" absent the Merger and, as a consequence, "would be forced to seek relief under the bankruptcy laws or negotiate the conversion of the debt into ADGE common stock at an unfavorable conversion ratio," "wip[ing] out" or "largely destroy[ing] the value of [the ADGE stockholders'] equity." Proxy 60. However, this justification rings hollow.

93.     As discussed above, as of early 2016, the Company had issued and outstanding $19.4 million in convertible debentures, representing approximately 81% of its overall debt. Beginning in May 2016, the Company executed a series of transactions (defined above as the Convertible Debt Transactions) that eliminated this debt.  Specifically, on May 4, 2016, the Company exchanged $9.3 million of its outstanding convertible debentures for shares in EuroSite Power.  On September 30, 2016, the Company executed additional transactions that further eliminated $6.7 million of its outstanding convertible debentures, which were exchanged for EuroSite Power shares.  On December 23, 2016, the Company settled the remaining $3.4 million of its outstanding convertible debentures for approximately $3.1 million.

94.     The Convertible Debt Transactions "strengthen[ed] the Company's balance sheet through the elimination of . . . the [C]ompany's outstanding convertible debt."  ADGE May 4, 2016 press release.  According to John Hatsopoulos, the debt reduction "put [ADGE] on more secure financial footing."  *Id*.  Bonnie Brown explained that "the elimination of the remaining balance of the convertible debt" in 2016, enabled ADGE to "enjoy[] a significant improvement in leverage ratios and reduction in interest expense in the first quarter of 2017."  ADGE May 11, 2017 press release.  Thus, well before the Merger was consummated, ADGE was not at risk of defaulting on its debt.

95.     Moreover, ADGE's most recent annual and quarterly reports for the past twelve months, filed on Forms 10-K and 10-Q with the SEC, respectively, mention no such dire liquidity problems.  Indeed, in the Company's most recent 10-K for the period ended December 31, 2016, the section on "Liquidity and Capital Resources" states:  "The Company believes that its existing resources, including cash and cash equivalents and future cash flow from operations plus cash provided by the sale of certain inventory and assets held for sale in January of 2017, are sufficient

to meet the working capital requirements of its existing business for the next 12 months[.]"  Nearly identical language is included in the "Description of Business" sections of the Company's recent 10-Qs, including the most recent 10-Q for the quarter ended March 31, 2017.

96.    Nor did ADGE's management's internal projections for the Company hint that it would be unable to handle its debt load.  Significantly, in preparing these projections, ADGE's management considered, among other things, "ADGE's ability to finance its operations and investments and refinance certain of its outstanding indebtedness and the terms of any such financing or refinancing . . . ."  Proxy 74.  According to the projections, ADGE's management expected that the Company's revenues, gross profits, and operating income would increase substantially between 2016 and 2020.  *Id.*

97.    Adjusted EBITDA, specifically, is pertinent here, as "ADGE believes that the presentation of Adjusted EBITDA provides useful information regarding its ability to service debt and provide useful information to investors regarding its results of operations because these measures are useful for trending, analyzing and benchmarking the performance and value of its business."  *Id.*  According to the projections, ADGE's management expected that the Company's Adjusted EBITDA would increase nearly five-fold, from $519,000 in 2016 to approximately $2.4 million by the end of 2020.  *Id.*

98.    In addition, the Proxy stated that, in rendering its financial opinion as to the adequacy of the Exchange Ratio, "Cassel Salpeter did not evaluate the solvency or creditworthiness of ADGE."  Proxy 68.  If potential insolvency or bankruptcy were such pressing issues at the time the Board agreed to the Merger, Cassel Salpeter surely would have taken these issues into account.  Moreover, if Cassel Salpeter had any concern about ADGE's solvency, it

certainly would have performed a liquidation analysis.  Neither it nor Tecogen's financial advisor performed such an analysis.

99.    Due to the inadequate and unfair Exchange Ratio, although ADGE stockholders will have the opportunity to participate as stockholders in the post-Merger entity, their level of participation (or ownership percentage) in the post-Merger entity is below what it would have been had they been fairly compensated for their ADGE shares.

## VI.    The Materially Incomplete and Misleading Proxy

100.    On April 27, 2017, the final version of the Proxy was mailed to ADGE's shareholders, soliciting their vote in favor of the Merger.  It was filed with the SEC the following day.  The Director/Officer Defendants, Tecogen, and Cassel Salpeter were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.

101.    The Proxy misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to votes in favor of the Merger, in violation of the Exchange Act provisions discussed herein and in breach of the Defendants' fiduciary duties.  In particular, the Proxy contained materially incomplete and misleading information concerning, *inter alia*:  the valuation analyses performed by ADGE's and Tecogen's respective financial advisors in support of their so-called "fairness opinions" that approved of the Exchange Ratio, and the flawed sales process leading to the Merger.

102.    The summaries of the valuation analyses performed by ADGE's and Tecogen's respective financial advisors, contained on pages 62-72 of the Proxy, were materially deficient in that they failed to disclose the following information.

103.    The Proxy stated that, in performing its valuation analyses, Cassel Salpeter reviewed certain information and data with respect to ADGE and Tecogen that was "made

available to Cassel Salpeter" by ADGE and Tecogen, including, *inter alia*: (i) each company's management's financial projections (the "Projections"); (ii) each company's management's estimates of their respective company's net operating loss tax carryforwards ("NOLs"); (iii) each company's management's estimates of their respective company's potential tax savings available based on their NOLs ("Estimated NOL Tax Savings"); and, (iv) as to Tecogen, certain pricing information for a recent equity financing effected by Ultratek Emissions Technologies Inc. ("Ultratek" and the "Ultratek Pricing Information"), a company in which Tecogen maintained an interest in a joint venture (collectively, the "Financial Inputs"). Proxy 68.

104.    However, aside from the Projections, which were summarized in the Proxy (pages 72-75), *none* of the other Financial Inputs (the "Omitted Financial Inputs") were disclosed. Disclosure of the Omitted Financial Inputs would have allowed ADGE shareholders to assess the validity of Cassel Salpeter's Discounted Cash Flow Analysis and the resulting implied exchange ratio range of 0.0719x to 0.0942x. Proxy 70. This is because, three of the four Financial Inputs Cassel Salpeter relied on exclusively when conducting its DCF Analysis were withheld from ADGE's unaffiliated shareholders. Proxy 69.

105.    Cassel Salpeter's DCF Analysis was fundamentally flawed and significantly undervalued ADGE. Indeed, Tecogen's financial advisor, Scarsdale, performed its own DCF Analysis—which, unlike Cassel Salpeter, did not consider the value of the Omitted Financial Inputs but did consider the value of potential synergies resulting from the Merger—and arrived at a much higher implied exchange ratio of 0.092 to 0.1235. Proxy at 65. Scarsdale also calculated a range of estimated equity values per ADGE share ($0.38 to $0.51 per share) that was *entirely* above the value of the consideration ADGE shareholders received in the Merger ($0.37 per share).

*Id*.  The Proxy does not disclose Cassel Salpeter's calculation of this range, or even whether Cassel Salpeter made such a calculation.

106.    The Omitted Financial Inputs were material to ADGE shareholders because they were necessary for ADGE shareholders to recognize the illegitimacy of Cassel Salpeter's DCF Analysis, to observe and appreciate the flaws in the analysis, and to recognize the unreliability of Cassel Salpeter's DCF analysis as a measure of the Company's intrinsic value.  The omission of the Omitted Financial Inputs rendered the implied exchange ratio reference range of 0.0719x to 0.0942x on page 70 of the Proxy, and the repeated statements that the Exchange Ratio was "fair" to ADGE's unaffiliated shareholders, misleading.  Without the Omitted Financial Inputs, the Company's shareholders were unable to recognize that the exchange ratio reference range Cassel Salpeter calculated and included in the Proxy did not reflect the Company's true value.

107.    The Proxy omitted other information that would have given ADGE's unaffiliated shareholders sufficient information to understand the financial analyses presented in the Proxy and cast informed votes.  Together, the Proxy contained the following material omissions concerning the financial advisors' valuation analyses:

      a.    The Proxy did not disclose the non-public Omitted Financial Inputs that the Proxy acknowledges Cassel Salpeter relied upon in opining that the Merger was fair.

      b.    The Proxy did not disclose the per share values of ADGE and Tecogen that Cassel Salpeter calculated in either its DCF Analysis (Proxy 70) or its Selected Transactions Analysis (Proxy 71), which would have allowed minority shareholders to compare the results of Cassel Salpeter's analysis to the companies' trading prices.

      c.    For Cassel Salpeter's Selected Companies Analysis (Proxy 70), the Proxy did not disclose the criteria Cassel Salpeter used in selecting its comparative publicly traded companies, especially Polaris Infrastructure Inc. and Maxim Power Corp., which were Canadian companies.  Maxim Power Corp. had been divesting a significant amount of its assets since 2014 and was in the

process of changing its business model, such that its revenues had plummeted from $142.9 million in 2014 to $19.6 million in 2015.

d.     For Cassel Salpeter's Selected Companies Analysis (Proxy 70), the Proxy did not disclose why Cassel Salpeter did not include any/all of ADGE's identified competitors, as identified in ADGE's 2016 10-K, pages 9-10.

e.     The Proxy did not disclose whether Scarsdale (unlike Cassel Salpeter) performed various financial analyses (i.e., Selected Publicly Traded Company Analysis, Selected Precedent Transaction Analysis, and Discounted Cash Flow Analysis) to derive ranges of values for Tecogen (they did perform these financial analyses to derive ranges of values for ADGE). If they did not, the Proxy does not disclose the reasons why not, and if they did, the Proxy omits the results therefrom.

f.     The Proxy did not disclose why either company's financial advisor failed to conduct a "contributions analysis" of the two companies, which would have demonstrated that ADGE's percentage contributions to the combined companies' total assets and total shareholders' equity was far greater than the percentage of equity ownership ADGE's stockholders received in the Merger.

g.     The Proxy did not disclose whether either ADGE or Tecogen, or their financial advisors, included the amortization of the $8.862 million in Unfavorable Contract Liability ("UCL") (as described on pages 15, 19, 20-22, 56 and 60 of the Proxy) in their projected EBITDA or DCF analyses for each company on a stand-alone basis. If, for example, Tecogen's projected EBITDA or DCF analysis included the UCL, but ADGE's did not, that would have artificially inflated Tecogen's projected profits relative to ADGE's, thus reducing the exchange ratio.

h.     The Proxy does not disclose the length of the contracts comprising the UCL. This information would be material to ADGE shareholders because if the unfavorable contracts were to expire in a relatively short amount of time, then ADGE's stockholders would have been able to consider this fact when determining whether to either vote in favor of the Merger before the expiration, or to wait until after the expiration to approve any merger transaction, at a time when ADGE's relative profitability on a stand-alone basis would have been higher, as presumably would the exchange ratio.

108.     As a highly-respected law professor explained in a thorough law review article regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions:

[C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions.

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1562 (2006).

109.    Professor Davidoff homes in on precisely why shareholders should not rely solely on a banker's valuation analyses, and why management's underlying inputs are critical - namely, because bankers take management's inputs and then make various highly subjective decisions to arrive at a share valuation.  For example, in a DCF analysis, Professor Davidoff explains that a banker takes management's forecasts, and then makes several key choices "**each of which can significantly affect the final valuation**." *Id.* at 1576.

110.    And as Professor Davidoff explains:

There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.

**This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process</u>, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).

111.    The description of the "Background of the Merger" contained on pages 52-56 of the Proxy was materially deficient in that it failed to disclose the following information about the sales process and Merger negotiations:

a.    The number of "informal meetings" between John Hatsopoulos and Benjamin Locke, or other members of either company's management team,

which took place outside of the presence of, and without the knowledge of, the boards of directors of ADGE and Tecogen, between January 2016 and March 2016.  Proxy 52.

b.    Why John Hatsopoulos and Benjamin Locke (and S&W) were permitted to participate in the meetings of the special committees of ADGE and Tecogen during the Merger negotiation process.

c.    Why the Special Committee never made a determination as to the fairness of the Convertible Debt Transaction despite the fact that it was an interested party transaction that the Special Committee discussed five times, including during its first meeting with outside counsel for Tecogen (while it was also serving as counsel for ADGE), ultimately remaining silent when it was approved by the full Board.

d.    Whether the Special Committee considered the Convertible Debt Transactions when it "determined to recommend to the ADGE Board of Directors the approval of the Merger and the Merger Agreement."

e.    Why the Board found it necessary to add Director/Officer Defendant Klaskin to the Special Committee on April 12, 2016, nearly a month after the Special Committee's formation and after it had met at least half a dozen times.  Proxy 53.

f.    Whether Cassel Salpeter previously provided financial advisory services to Tecogen or to the ADGE Board as a whole (including non-independent directors) or individually, and, with respect to each, what it was paid for rendering those services.  The prospect that such work would have taken place in the past, and therefore caused Cassel Salpeter to be conflicted, is strengthened by the close business, management, and ownership ties between ADGE and Tecogen.

112.    In sum, Defendants omitted material information from the Proxy, which rendered the statements therein materially incomplete and misleading, in contravention of the Exchange Act.  Lead Plaintiff and the other members of the Class were thus unable to make a fully informed decision regarding whether to vote in favor of the Merger.

## COUNT I

### Claim for Violation of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### (Against All Defendants)

113.    Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

114.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

115.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).

116.    Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the [Securities and Exchange] Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders.  No representation contrary to the foregoing shall be made."  17 C.F.R. § 240.14a-9(b).

117.    Defendants prepared, reviewed, filed and disseminated the false and misleading Proxy to ADGE's shareholders.  In doing so, Defendants negligently failed to ensure that the Proxy did not contain material misrepresentations and/or omissions.  This count does not sound, and is

not intended to sound, in fraud.

118.    In particular, the Proxy contained materially incomplete and misleading information concerning, *inter alia*:  the valuation analyses performed by ADGE's and Tecogen's respective financial advisors in support of their so-called "fairness opinions" that approved of the Exchange Ratio, and the flawed sales process leading to the Merger.

119.    The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares.  In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

120.    By virtue of their positions within the Company and/or roles in the process in the preparation of the Proxy, Defendants were undoubtedly aware of the correct and complete material information and had or should have previously reviewed it, or were negligent in not reviewing it, including participating in the Merger negotiation and sales process and reviewing Cassel Salpeter's complete financial analysis purportedly summarized in the Proxy.

121.    The Director/Officer Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger; indeed, the Proxy states that Cassel Salpeter reviewed and discussed its financial analyses with the Director/Officer Defendants, and further states that the Director/Officer Defendants considered the financial analyses provided by Cassel Salpeter as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  The Director/Officer Defendants therefore were negligent in failing to ensure that the Proxy contained no material misrepresentations and/or omissions.

122.    ADGE is deemed negligent as a result of the Director/Officer Defendants'

negligence in preparing and reviewing the Proxy.

123.    Tecogen and Merger Sub, via its officers and/or directors, also prepared and/or reviewed the Proxy, as Tecogen filed the S-4 and issued the ***joint*** Proxy along with ADGE. Tecogen and Merger Sub thus permitted the use of its name to solicit proxies from ADGE shareholders.   Tecogen also modified certain projections originally prepared by ADGE management to reflect Tecogen management's assessment of ADGE's business and the potential synergies that might be realized in a merger, and was thus aware of these projections.   Tecogen and Merger Sub negligently failed to ensure that the Proxy did not contain material omissions/misrepresentations.

124.    Defendants also knew that Lead Plaintiff and the Class would, and did, rely upon the Proxy in determining whether to vote in favor of the Merger.

125.    As a direct and proximate result of these Defendants' preparation, review and dissemination of the false and/or misleading Proxy that was used to obtain shareholder approval of the Merger, ADGE shareholders were induced to vote their shares and accept the inadequate Merger Consideration without the ability to make an informed decision with respect thereto.   Lead Plaintiff and the Class have therefore suffered damages and actual economic losses (i.e. the difference between the consideration ADGE shareholders received and ADGE's true value at the time of the Merger) in an amount to be determined at trial.

## COUNT II

**Claim for Violations of Section 20(a) of the Exchange Act
(Against the Director/Officer Defendants)**

126.    Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127.    The Director/Officer Defendants acted as controlling persons of ADGE within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of ADGE, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are materially incomplete and misleading.

128.    Each of the Director/Officer Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

129.    In particular, each of the Director/Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contained the unanimous recommendation of each of the Director/Officer Defendants to approve the Merger.  They were thus directly involved in preparing this document.

130.    In addition, as the Proxy set forth at length, and as described herein, the Director/Officer Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purported to describe the various issues and information that the Director/Officer Defendants reviewed and considered.  The Director/Officer Defendants participated in drafting and/or gave their input on the content of those descriptions.

131.    By virtue of the foregoing, the Director/Officer Defendants have violated Section

20(a) of the Exchange Act.

132.    As set forth above, the Director/Officer Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

133.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the Class have been injured and suffered damages in an amount to be determined at trial.

## COUNT III

### Claim for Breach of Fiduciary Duties
### (Against the Director/Officer Defendants)

134.    Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

135.    As alleged herein, the Director/Officer Defendants failed to exercise the care required, and breached their duties of loyalty, due care, good faith and candor owed to ADGE shareholders because, among other reasons, they failed to take steps to obtain the highest available value for ADGE consideration under the circumstances, failed to adequately consider other strategic alternatives, and favored their own, or their fellow directors' or executive officers' interests, to secure all possible benefits with a friendly suitor, rather than protect the best interests of ADGE's unaffiliated shareholders.

136.    As a direct and proximate result of these Defendants' breaches of fiduciary duty, Lead Plaintiff and the Class have been injured and suffered damages in an amount to be determined at trial.

## COUNT IV

**(Against John Hatsopoulos and George Hatsopoulos for Breaches of Fiduciary Duty in Their Capacity as a Control Group)**

137.    Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

138.    John Hatsopoulos and George Hatsopoulos, acting in concert and together as a group, are controlling shareholders of ADGE and Tecogen, as they stood on both sides of the Merger transaction, had significant ownership stakes in both companies, and had "the ability to control various corporate decisions," including "the election of directors" and "the outcome of any other matter requiring shareholder approval, including a merger."  Because they acted in concert as a control group and stood on both sides of the Merger transaction, they will have the burden at trial of proving that the transaction was entirely fair to Lead Plaintiff and the Class.

139.    The Hatsopolous brothers will be unable to meet their burden of entire fairness because they violated their fiduciary duties of loyalty, care, and good faith owed to ADGE's unaffiliated shareholders by placing their personal interests ahead of the interests of Lead Plaintiff and the Class, and foisting an unfair transaction, both in terms of process and price, upon Lead Plaintiff and the Class.

140.    John Hatsopoulos also caused ADGE to sell himself a valuable asset for much less than its market value, in the self-dealing, Convertible Debt Transaction.  This potentially exposed him and the other ADGE directors to derivative liability, which would have been eliminated by the Merger.

141.    As a direct and proximate result of these Defendants' breaches of fiduciary duty, Lead Plaintiff and the Class have been injured and suffered damages in an amount to be determined at trial.

## COUNT V

**(Against George Hatsopoulos, Tecogen and Merger Sub for Aiding and Abetting the Director/Officer Defendants' Breaches of Fiduciary Duty)**

142.    Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

143.    George Hatsopoulos, Tecogen and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Director/Officer Defendants have breached their fiduciary duties to ADGE shareholders, and have facilitated and/or participated in such breaches of fiduciary duties.

144.    George Hatsopoulos, Tecogen and Merger Sub knowingly aided and abetted the Director/Officer Defendants' wrongdoing alleged herein.   In so doing, George Hatsopoulos, Tecogen and Merger Sub rendered substantial assistance in order to effectuate the Director/Officer Defendants' plan to consummate the Merger in breach of their fiduciary duties.

145.    As a direct and proximate result of these Defendants' actions in aiding and abetting breaches of fiduciary duty, Lead Plaintiff and the Class have been injured and suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Directing the Defendants to account to Lead Plaintiff and the Class for all damages sustained as a result of their wrongdoing, including compensatory and/or rescissory damages;

C.    Awarding Lead Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and expert fees and expenses;

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury on all issues so triable.

Dated: June 19, 2017                         **BERMAN DEVALERIO**

                                             */s/ Nathaniel L. Orenstein*
                                             Norman Berman (BBO 040460)
                                             Nathaniel L. Orenstein (BBO 664513)
                                             One Liberty Square
                                             Boston, MA  02109
                                             Tel:  617-542-8300
                                             Fax:  617-542-1194
                                             Email:  nberman@bermandevalerio.com
                                                     norenstein@bermandevalerio.com

                                             Jason M. Leviton (BBO 678331)
                                             **BLOCK & LEVITON LLP**
                                             155 Federal Street, Suite 400
                                             Boston, MA 02110
                                             Tel: (617) 398-5600
                                             Fax: (617) 507-6020
                                             Email:  jason@blockesq.com

                                             *Co-Liaison Counsel*

**WOLF POPPER LLP**
Carl L. Stine
Robert S. Plosky
845 Third Avenue
New York, New York 10022
Tel:  212-759-4600
Fax:  212-486-2093
Email: cstine@wolfpopper.com
       rplosky@wolfpopper.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405

New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

*Attorneys for Lead Plaintiff and Co-Lead Counsel*

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA  19004
Tel:  (610) 667-6200
E-mail:esmith@brodskysmith.com
        mackerman@brodskysmith.com

*Additional Attorneys for Lead Plaintiff*

## **CERTIFICATE OF SERVICE**

I, Nathaniel L. Orenstein, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 19, 2017.

/s/ *Nathaniel L. Orenstein*
Nathaniel L. Orenstein