**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEE VARDAKAS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN DG ENERGY INC., JOHN N. HATSOPOULOS, GEORGE N. HATSOPOULOS, BENJAMIN LOCKE, CHARLES T. MAXWELL, DEANNE M. PETERSEN, CHRISTINE M. KLASKIN, JOHN ROWE, JOAN GIACINTI, ELIAS SAMARAS, TECOGEN INC., TECOGEN.ADGE ACQUISITION CORP., AND CASSEL SALPETER & CO., LLC, <br> Defendants. | Case No. 17 cv 10247 - MPK |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     STATEMENT OF FACTS ....................................................................................... 2

        A.      Background ................................................................................................. 2

        B.      The Unfair Merger Process ......................................................................... 4

        C.      The Unfair Merger Consideration................................................................ 5

        D.      Plaintiff's Action ........................................................................................ 6

III.    ARGUMENT .......................................................................................................... 7

        A.      Legal Standards ........................................................................................... 7

        B.      The Proxy's Material Omissions ................................................................. 8

                1.      Material Omissions Concerning the Merger Events ................................... 8

                2.      Material Omissions Concerning Cassel's Analyses ................................. 11

                3.      Material Omissions Concerning ADGE's UCL ....................................... 15

                4.      Plaintiff's Complaint Does Not Immunize Defendants' Conduct ........... 16

        C.      Plaintiff Has Successfully Pled § 20(a) Claims .................................... 16

        D.      The Court Undoubtedly Has Diversity Jurisdiction............................... 18

        E.      The Court Should Retain Supplemental Jurisdiction over the State Law
                Claims .................................................................................................... 19

IV.     CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITES

**Cases**

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.,*
   38 F.3d 211 (5th Cir. 1994) ..................................................................................... 16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................................ 7

*In re Atheros Commc'ns, Inc.,*
   No. CIV.A. 6124-VCN, 2011 WL 864928 (Del. Ch. Mar. 4, 2011) ...................................... 11

*Audette v. Carrillo,*
   C.A. No. 15-cv-13280-ADB, 2017 U.S. Dist. LEXIS 37962 (D. Mass. Mar. 16, 2017) ....... 19

*Azar v. Blount Int'l, Inc.,*
   No. 3:16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493 (D. Or. Mar. 20, 2017) ..................... 12, 13

*Biver v. Nicholas Financial, Inc.,*
   No. 8:14-cv-250-T-33TGW, 2014 U.S. Dist. LEXIS 73933 (M.D. Fla. May 30, 2014)... 13, 14

*Bonazoli v. R.S.V.P. Int'l, Inc.,*
   353 F. Supp. 2d 218 (D.R.I. 2005) ......................................................................... 19

*Brody v. Stone & Webster, Inc.,*
   414 F.3d 187 (1st Cir. 2005) .............................................................................. 16, 17

*Cadogan v. Warren,*
   No. : 08-CV-13456-DT, 2009 U.S. Dist. LEXIS 14157 (E.D. Mich. Feb. 24, 2009) ............ 19

*Calleros v. FSI Int'l, Inc.,*
   892 F. Supp. 2d 1163 (D. Minn. 2012) .................................................................. 11

*Camelio v. Am. Fed'n,*
   137 F.3d 666 (1st Cir. 1998) ................................................................................ 20

*Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.,*
   No. 12-10085-RWZ, 2013 U.S. Dist. LEXIS 19227 (D. Mass. Feb. 13, 2013) ................. 8, 14

*City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Estate Trust, Inc.,*
   635 F. Supp. 2d 783 (N.D. Ill. 2009) ........................................................... 13, 14, 15

*ConnectU LLC v. Zuckerberg*,
    522 F.3d 82 (1st Cir. 2008) ................................................................................. 18

*David P. Simonetti Rollover IRA v. Margolis*,
    C.A. No. 3694-VCN,  2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008) ............................ 11

*Dowling v. Narragansett Capital Corp.*,
    735 F. Supp. 1105 (D.R.I. 1990) .................................................................... 12, 13

*Frank v. Elgamal*,
    C.A. No. 6120-VCN, 2012 WL 1096090 (Del. Ch. Mar. 30, 2012) ...................................... 4

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996) .................................................................................. 8

*Grogan v. O'Neil*,
    292 F. Supp. 2d 1282 (D. Kan. 2003) .................................................................... 20

*In re JCC Holding Co., Inc.*,
    843 A.2d 713 (Del. Ch. 2003) ............................................................................... 5

*In re JPMorgan Chase & Co. Sec. Litig.*,
    MDL No. 1783, 2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 18, 2007) ...................... 14, 15

*Isquith ex rel. v. Middle South Utils., Inc.*,
    847 F.2d 186 (5th Cir. 1988) .......................................................................... 7, 8

*Kahn v. Lynch Commc'n Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) ................................................................................... 3

*Kas v. Financial General Bankshares, Inc.*,
    796 F.2d 508 (D.C. Cir. 1986) ............................................................................ 11

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999) .................................................................... 17

*Louisiana Mun. Police Employees' Ret. Sys. v. Crawford*,
    918 A.2d 1172 (Del. Ch. 2007) .......................................................................... 11

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) ...................................................................................... 16

*MAZ Partners LP v. Shear*,
    218 F. Supp. 3d 132 (D. Mass. 2016) .................................................................... 8

*In re Netsmart Techs., Inc. S'holders Litig.*,
     924 A.2d 171 (Del. Ch. 2007) ............................................................. 12

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements*,
     101 F.3d 1492 (3d Cir. 1996) ............................................................. 20

*Niehoff v. Maynard*,
     299 F.3d 41 (1st Cir. 2002) ............................................................... 7

*In re Parmalat Sec. Litig.*,
     375 F. Supp. 2d 278 (S.D.N.Y. 2005) ................................................. 17

*Pavlidis v. New England Patriots Football Club, Inc.*,
     737 F.2d 1227 (1st Cir. 1984) ........................................................ 8, 16

*In re Pure Res. S'holders Litig.*,
     808 A.2d 421 (Del. Ch. 2002) ............................................................. 12

*Roche v. John Hancock Mut. Life Ins. Co.*,
     81 F.3d 249 (1st Cir. 1996) ............................................................... 19

*Rockwell International Corp. v. United States*,
     549 U.S. 457 (2007) ......................................................................... 18

*Rosenblatt v. Getty Oil Co.*,
     493 A.2d 929 (Del. 1985) ................................................................... 8

*Ross v. Sam's E., Inc.*,
     No. 8:06-cv-887-T-26EAJ, 2006 U.S. Dist. LEXIS 38838 (M.D. Fla. June 12, 2006) .......... 19

*In re Saba Software, Inc.*,
     C.A. No. 10697-VCS, 2017 Del. Ch. LEXIS 52 (Del. Ch. Mar. 31, 2017) .................... *passim*

*Sepúlveda-Villarini v. Dep't of Educ. of P.R.*,
     628 F.3d 25 (1st Cir. 2010) ............................................................... 7

*Smith v. Robbins & Myers, Inc.*,
     969 F. Supp. 2d 850 (S.D. Ohio 2013) ...................................................... 12, 13, 14

*St. Louis Police Ret. Sys. v. Severson*,
     Case No.: 12-CV-5086 YGR, 2012 U.S. Dist. LEXIS 152392 (N.D. Cal. Oct. 23, 2012) .... 16

*Toland v. Margulies*,
     93cv3549(MBM), 1993 U.S. Dist. LEXIS 16148 (S.D.N.Y. Nov. 10, 1993) ........................ 18

*In re Trump Hotels Shareholder Derivative Litig.*,
    No. 96 Civ. 7820 (DAB), 2000 U.S. Dist. LEXIS 13550 (S.D.N.Y. Sept. 21, 2000) ............ 14

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ................................................................................................................ 8

*Va. Bankshares v. Sandberg*,
    501 U.S. 1083 (1991) ............................................................................................................ 14

*Wilson v. Great Am. Indus.*,
    855 F.2d 987 (2d Cir. 1988) ................................................................................................ 11

*In re Zhongpin Inc. S'holders Litig.*,
    No. CV 7393-VCN, 2014 WL 6735457 (Del. Ch. Nov. 26, 2014), *rev'd on other grounds*,
    115 A.3d 1173 (Del. 2015) ..................................................................................................... 3

**Statutes**

15 U.S.C. § 78n(a) ...................................................................................................................... 7

15 U.S.C. § 78t(a) ....................................................................................................................... 7

15 U.S.C. § 78u-4(a)(3)(B) ......................................................................................................... 6

**Other Authorities**

Steven M. Davidoff, *Fairness Opinions*,
    55 Am. U.L. Rev. 1557 (Aug. 2006) ............................................................................... 12, 13

**Rules**

17 CFR § 240.14a–9 (1990) ........................................................................................................ 7

## I.       PRELIMINARY STATEMENT

Lead Plaintiff William Chase May ("Plaintiff" or "May") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss ("Mot."). Defendants' Motion is noteworthy for what it does *not* assert. Plaintiff seeks damages, on behalf the former holders of ADGE common stock, arising from the grossly unfair merger in which ADGE was acquired by Tecogen.[1] The Complaint alleges that the Merger was rife with conflicts of interest and self-dealing, enriching the controlling Hatsopoulos family shareholders and other corporate insiders at the expense of ADGE's public shareholders. Consequently, it is Defendants' burden at trial to demonstrate that the Merger was entirely fair, in process and price, to ADGE's public shareholders, a burden Plaintiff submits Defendants will be unable to meet. Defendants do not rebut the substance of these allegations, effectively acknowledging Plaintiff's state law fiduciary duty claims are meritorious (or at the very least, that Plaintiff sufficiently alleged such claims). *See, e.g.,* Mot. at 1 (Motion's focus is only on "the truthfulness" of the Proxy).

Instead, Defendants only attack the substance of Plaintiff's federal claims, namely those arising from ADGE's Proxy, which urged shareholders to approve the Merger. While the Motion is heavy on boilerplate legal citations, it fails to apply these legal principles to the facts actually alleged. As explained below, Defendants' characterization of the Complaint's disclosure allegations as of the "tell me more" variety misses the mark: additional disclosures would not have simply been useful. Rather, Plaintiff alleges that Defendants withheld information which courts have repeatedly held are vital for shareholders evaluating a merger, and that without the necessary disclosure, certain identified statements in the Proxy were materially misleading.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in Plaintiff's Amended Class Action Complaint filed on June 19, 2017, Dkt. 34 (the "Complaint").

The portions of Defendants' Motion arguing that this Court either lacks or should decline jurisdiction over Plaintiff's state law claims are also unavailing. *First*, Defendants are simply wrong that *non-party* Lee Vardakas's mere mention in this Action's caption, due to his filing of an earlier, superseded pleading, somehow defeats diversity jurisdiction. Defendants cite no support for such a novel legal proposition. *Second*, given that Plaintiff has adequately alleged federal claims in connection with the Proxy, the Court should exercise supplemental jurisdiction over the related Delaware state law claims. And, even if the federal claims were dismissed, the Court should still retain jurisdiction in the interests of fairness.

## II.   STATEMENT OF FACTS[2]

### A.   Background

Until consummation of its unfair merger into Tecogen, ADGE was a Delaware corporation, which distributed and operated on-site electricity, hot water, heating, and cooling systems, with principal offices in Waltham, Massachusetts. ¶¶ 24, 49. The Company was co-founded by Defendant John Hatsopoulos, who also co-founded Tecogen. By Defendants' own admission, ADGE and Tecogen are "affiliated companies by virtue of common ownership and common leadership." ¶ 47. For example, the two companies shared an address, as well as some key personnel, such as several board members and senior management, including co-CEOs. ¶¶ 3, 29, 30. John Hatsopoulos was the co-CEO of both companies, and served as a director of each since the early 2000s. ¶ 4. Charles C. Maxwell, the Chairman of the ADGE Board, was also a member of Tecogen's board of directors. ¶ 29. George Hatsopoulos, John Hatsopoulos's brother, had roles in both companies, including as Chairman of the ADGE Board, and technical advisor to the

---

[2] A summary of the pertinent facts follows. The facts set forth in the Complaint are incorporated herein by reference. All references to "¶ _" refer to paragraphs in the Complaint.

Company, as well as director of the Tecogen board.  ¶ 36.  An earlier version of the Proxy conceded that a transaction between the two companies could be subject to "additional scrutiny" due to the danger of "self-dealing or conflict of interest." ¶ 47.

The Hatsopoulos brothers owned a controlling stake of stock and served as members of the boards of directors for both companies: at the time of the Merger, the Hatsopoulos brothers owned or controlled more than 34% of ADGE common stock and more than 23% of Tecogen common stock.  ¶ 5.  Thus, controlling shareholders stood on both sides of any transaction between the two companies.  ¶¶ 27, 46, 50-60.[3]  Defendants acknowledged the Hatsopoulos brothers' control over ADGE, which could be exploited for selfish purposes, in many SEC filings.[4]  Even prior to the Merger, John Hatsopoulos used his control over ADGE for self-serving ends.  ¶¶ 59-60.  For example, he engaged in several financing transactions with the Company, which, among other things, rendered ADGE indebted and beholden to him.  ¶ 59. [5]

---

[3] The relative market values of the Hatsopoulos brothers' controlled common stock holdings was approximately $5.6 million for ADGE and $17.9 million for Tecogen.  The Hatsopoulos brothers thus had a tremendous financial incentive to protect the value of their Tecogen stock, even at the expense of the value of their ADGE shares. ¶52.

[4] For example, the 10-Ks issued by both ADGE and Tecogen while Merger negotiations were underway noted that the Hatsopoulos bothers "control[led] various corporate decisions [of each company], including . . . the election of directors . . . and the outcome of any other matter requiring shareholder approval, *including a merger.*" ¶ 53 (emphasis added).  Earlier 10-Ks made the same point, one noting that ADGE was "controlled by a small group of majority stockholders" specifically conceding that "George N. Hatsopoulos and John Hatsopoulos . . . . with a small group of other major shareholder, have the ability to control various corporate decisions. . . ." ¶¶ 54-57.  The Proxy itself noted that the Hatsopoulos brothers, along with other ADGE officers and directors (who themselves owned approximately 9.05% of ADGE common stock), "could exert influence on matters requiring approval by ADGE's stockholders, including the election of directors, [and] the approval of mergers or other business combination transactions . . ." ¶ 57.

[5] Defendants argue that "even combined, John and George Hatsopoulos held only a minority interest in both companies," Mot. at 8, which is irrelevant, as the law imposes fiduciary duties upon shareholders who control the business affairs of the company, even if they own non-majority stakes.  *Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d 1110, 1115 (Del. 1994); *In re Zhongpin Inc. S'holders Litig.,* No. CV 7393-VCN, 2014 WL 6735457, at *8 (Del. Ch. Nov. 26, 2014) (plaintiff adequately alleged that 17% shareholder was controller), *rev'd on other grounds,* 115 A.3d 1173 (Del. 2015).  In any event, ADGE's 10-K acknowledged that it was "controlled by a small group of majority stockholders." ¶ 54.  Defendants also feign a distinction between shares owned by the Hatsopoulos brothers outright and those shares owned in trust or by their

B.      The Unfair Merger Process

As Defendants acknowledge, the Merger arose from "discussions between ADGE's co-founder John Hatsopoulos and Benjamin Locke, who was the CEO of both Tecogen and ADGE, in January 2016." Mot. at 3-4.  In other words, Merger "discussions" took place among the co-CEOs of both companies, one of whom was the controlling shareholder of both companies.  These conversations took place outside the presence of, and without being disclosed to, either company's board of directors.  ¶ 63.  Thus, from the onset, the Merger negotiations lacked arms-length protections.  The Proxy does not describe the number of these meetings that took place.  Finally, on March 15, 2016, Hatsopoulos and Locke informed their companies' boards of their discussions, and (likely in recognition of the gravity of the situation) both boards convened special committees that very day. ¶ 65.  The ADGE Special Committee, however, was not independent: aside from the fact that the Hatsopoulos brothers controlled the election of its members, the Special Committee allowed John Hatsopoulos as well as Sullivan and Worcestor LLP (outside counsel for *both* companies, and defense counsel here) to participate in its meetings.  ¶ 66.  As admitted in the Proxy, at no point did ADGE "run a competitive auction," and the Special Committee's financial advisor, Cassel Salpeter ("Cassel"), "was not authorized to, and did not, solicit indications of interest from third parties."  ¶ 68.  Nor did the Special Committee attempt to negotiate a provision conditioning the approval of the Merger upon the vote of a majority of the unaffiliated ADGE shareholders, which would have empowered minority shareholders with a degree of agency. ¶ 68.[6]

---

family members, Mot. at 8, which is baseless as the brothers effectively controlled these shares as well (a point Defendants do not deny).

[6] Defendants presume that their failure to agree on a "majority of the minority" provision is "moot given the insubstantial voting opposition." Mot. at 8, n.36. However, the Proxy informed shareholders that "given the large insider holdings of both companies, it is believed that there is a high likelihood of completion of the transaction." ¶ 69. Thus, those voting "yes" did so likely knowing that the Merger was a "foregone conclusion," which is why Delaware law rejects this sort of post-hoc argument. *Frank v. Elgamal,* C.A. No. 6120-VCN, 2012 WL 1096090, at *10, n.71 (Del. Ch. Mar. 30, 2012).  In fact, it is a "fundamental

Concurrently with the Merger, John Hatsopoulos caused ADGE to sell him and two ADGE debt-holders valuable shares of an ADGE European subsidiary, EuroSite Power, for a fraction of their market value (the "Convertible Debt Transactions"). ¶¶ 72-82. Specifically, the exchange price used to calculate the number of EuroSite shares was $0.40 per share, even though the market price on that date was $.80 per share. ¶ 79. The transactions provided John Hatsopoulos and the debt-holders (also shareholders of ADGE) special merger benefits not shared by the public ADGE shareholders. Moreover, the transactions likely exposed John Hatsopoulos and the Board to derivative liability: liability likely extinguished upon the Hatsopoulos-controlled Merger. ¶ 81. The Proxy withheld critical information concerning these transactions, described herein.

## C.     The Unfair Merger Consideration

Given the unfair Merger process that John Hatsopoulos orchestrated, it is not surprising that the Merger consideration was inadequate. Pursuant to the Merger, each share of ADGE common stock was acquired by Tecogen in exchange for .092 shares of Tecogen Common stock (the "Exchange Ratio"). Based on the $4.02 closing price of Tecogen common stock on May 18, 2017 (the day the Merger became effective), ADGE shareholders were given the equivalent of approximately $0.37 per share, which was significantly below ADGE's 52-week trading high, at the time of the Merger's announcement, of $0.52 per share. ¶ 83.[7] The Exchange Ratio also failed to compensate ADGE shareholders for ADGE's asset contribution to the combined company: ADGE's total assets and total shareholders' equity represented 45% and 54%, respectively, of the

---

premise" of Delaware law that controlling shareholder mergers are "inherent[ly] coerc[ive]" and thus even unanimous and *fully informed* shareholder approval of the transaction cannot "extinguish[ ] equitable challenges to the merger's fairness." *In re JCC Holding Co., Inc.,* 843 A.2d 713, 723-24 (Del. Ch. 2003).

[7] While Defendants minimize the significance of the 52-week high, Mot. at 6, they make no attempt to rebut the many other allegations concerning the unfair Merger price. *See generally* ¶¶ 83-99 (describing, in detail, why the Exchange Ratio was inadequate (i.e., Defendants fail their burden of establishing fair price under entire fairness) which the Motion does not dispute).

combined assets and shareholders' equity of the new company, yet ADGE's shareholders received only 19% of the equity ownership. This resulted not only in a significant financial loss, but also in ADGE shareholders "exercis[ing] less influence over [the] management . . . and policies" over the post-Merger entity.  ¶ 84 (quoting the Proxy).  Curiously, *Tecogen's* financial advisor, Scarsdale Equities LLC ("Scarsdale"), performed a Discounted Cash Flow ("DCF") analysis showing that ADGE's shares were worth as much as $0.51 per share, much higher than the $0.37 per share ADGE's shareholders received.  ¶¶ 85, 105.

After Cassel presented its flawed Fairness Opinion, the Special Committee and thereafter the Board voted to approve the Merger.  The Merger was signed on November 1, 2016, and publicized the following day.  On April 28, 2017, ADGE and Tecogen's boards authorized the filing of a final joint proxy statement/prospectus, which was defective. ¶ 15.  On May 18, 2017, the Merger was approved at the special meeting of shareholders, closing thereafter.  *Id.*[8]

**D.      Plaintiff's Action**

Plaintiff May, a citizen of Louisiana and ADGE shareholder, initially challenged the Merger in Massachusetts Superior Court.  After the action bearing this caption was filed by ADGE shareholder Lee Vardakas, Vardakas and May jointly moved to appoint *May* as sole Lead Plaintiff under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B), and for approval of May's selection of legal counsel, Dkt. 18, which this Court granted, Dkt. 25. May thereafter filed the Amended Class Action Complaint, which does not identify Vardakas as a

---

[8] Defendants claim that the Merger Agreement contained no "deal protection devices . . . which could discourage interested suitors" (Mot. at 4).  This is a non-sequitur, as the Merger, which included ADGE's controlling shareholder group as a party, was inherently "deal protective."  As the Proxy itself concedes, ADGE's "concentration of ownership may discourage or prevent someone from acquiring ADGE's business."  ¶57.

party.[9] Vardakas, with no operative pleading on file, has no involvement in this litigation, aside from being an absent class member, as is true with perhaps thousands of other people.

In the Complaint, May asserts i) violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 CFR § 240.14a–9 (1990); ii) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); iii) breach of fiduciary duty against the Director/Officer Defendants; iv) breach of fiduciary duty against the Hatsopoulos brothers as controlling shareholders; and v) aiding and abetting breach of fiduciary duty against George Hatsopoulos, Tecogen, and Tecogen's merger subsidiary.

## III.   ARGUMENT

### A.   Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[10] "Asking for plausible grounds…does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 30 (1st Cir. 2010).   A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss. *Id.* "[D]etailed factual allegations" are not required. *Iqbal*, 556 U.S. at 678.

The determination of whether information has been adequately disclosed is generally a mixed question of fact and law, and, therefore, for the jury.  *See Isquith ex rel. v. Middle South Utils., Inc.*, 847 F.2d 186, 208 (5th Cir. 1988); *see also Niehoff v. Maynard*, 299 F.3d 41, 47–48 (1st Cir. 2002).   Such a determination "requires delicate assessments of the inferences a

---

[9] May, unlike Vardakas, did not sue Cassel.  While identified in the caption, it is undisputed that Cassel is a non-party.

[10] Unless explicitly noted otherwise, internal citations are omitted throughout.

'reasonable shareholder would draw from a given set of facts and the significance of those inferences to him . . . assessments [which] are particularly ones for the trier of fact.'" *Isquith* (*quoting TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *Pavlidis v. New England Patriots Football Club, Inc.*, 737 F.2d 1227, 1231 (1st Cir. 1984) (same).  Whether an omission is material "does not require proof of a substantial likelihood that the disclosure of the omitted fact would have caused the reasonable investor to change its vote," but merely "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder," i.e., that the disclosure "would have been viewed by the reasonable investors as having significantly altered the 'total mix' of information made available."  *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985); *see also MAZ Partners LP v. Shear,* 218 F. Supp. 3d 132, 137-38 (D. Mass. 2016) (same).

Materiality should only be determined as a matter of law "in extreme cases" where the alleged misrepresentations are "so obviously unimportant to an investor that reasonable minds cannot differ. . . ." *Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, No. 12-10085-RWZ, 2013 U.S. Dist. LEXIS 19227, at *20-21 (D. Mass. Feb. 13, 2013) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 632 n.22 (1st Cir. 1996)). "In view of the prophylactic purpose of [Rule 14a-9] and the fact that the content of the proxy statement is within management's control, it is appropriate that these doubts [as to whether information is critical] be resolved in favor of those the statute is designed to protect." *TSC Indus.*, 426 U.S. at 448.

## B.    The Proxy's Material Omissions

### 1.    Material Omissions Concerning the Merger Events

Paragraph 111 of the Complaint lays out in detail how the Proxy failed to disclose material information concerning the events leading up to the Merger.  For example, absent the outright resignation of an existing member, it is highly unusual for a special committee to reconstitute itself

so as to add a new member, yet that is precisely what occurred when Director/Officer Defendant Klaskin joined the Special Committee on April 12, 2016, nearly a month after its formation. Nonetheless, the Proxy failed to disclose why the Board found it appropriate to appoint a new member. ¶ 111(e). Defendants made no effort to dispel reasonable shareholder suspicion on this issue. *See In re Saba Software, Inc.,* C.A. No. 10697-VCS, 2017 Del. Ch. LEXIS 52, at *37 n.72 (Del. Ch. Mar. 31, 2017) (proxy must disclose missing fact concerning reason for missing deadline, whether omitted fact is "benign or otherwise" irrelevant).

The Proxy also failed to disclose whether the Special Committee evaluated the fairness of the Convertible Debt Transactions, or whether it considered those Transactions when it recommended the Merger. ¶ 111(c) and (d). Defendants deny these omissions are material. Mot. at 22, 24. However, the Special Committee discussed the Convertible Debt Transactions (which, like the Merger, greatly enriched the Hatsopoulos family) several times, starting almost as soon as it was formed. ¶¶ 76-77. As the Special Committee was formed solely with the power to "evaluate a merger with Tecogen," its repeated discussions concerning Convertible Debt Transactions demonstrate that those were undeniably Transactions related, and important to, the Special Committee's evaluation of the Merger. *Id.* at 76. Yet, aside from disclosing these initial discussions, the Proxy does not disclose whether the Special Committee considered the Convertible Debt Transactions—and the conflicts of interest they created among John Hatsopoulos and others—when recommending the Merger to the Board. ¶ 111(d). This omission of such a material issue is odd, at best.[11]

---

[11] Defendants insinuate that because the Proxy disclosed that the Special Committee considered the Convertible Debt Transactions in meetings during March and April 2016, that means it must have also considered such Transactions (and the conflicts they created) when recommending the Merger to the Board. Mot. at 24. Defendants' counsel are simply reading their own speculative account of events into the Proxy, as the Proxy itself provides no discussion that would allow a shareholder to definitively link these two occurrences. Indeed, the Special Committee did not recommend the Merger for an additional *six* months.

Had the Special Committee considered the relevance of the Convertible Debt Transaction when it decided to recommend the Merger, this would have suggested that the Committee was prepared to ask the difficult and uncomfortable questions about its looming controlling shareholders' conflicting interests.  Had the Special Committee remained silent on this issue at the final meeting before its vote (i.e., its moment of truth), *despite having discussed it at least five times*, it would have demonstrated to shareholders that the Special Committee was not independent, but rather beholden to Hatsopoulos.  As already noted, an earlier version of the Proxy *conceded* that the potential for "self-dealing" and "conflict of interest" inhered in the Merger.  ¶ 47.  Defendants again eschewed dispelling shareholder suspicions of unfair dealing. *See, e.g., Saba,* 2017 Del. Ch. LEXIS 52, at *36, n.71 ("Once a company travels down the road of partial disclosure of the history leading up to the Merger it has an obligation to provide the stockholders with an accurate, full and fair characterization of those historic events.").

The Proxy also failed to disclose the number of purportedly "informal meetings" between John Hatsopoulos and Benjamin Locke prior to the Special Committee's involvement.  ¶ 111(a).  Defendants claim, "[w]hether there were three or thirty 'informal meetings' – so what?" Mot. at 22.  However, many meetings between Hatsopoulos and Locke would suggest that the basic terms of the Merger Agreement were already hashed out before the intervention of a purportedly neutral and dispassionate special committee.  Many meetings would demonstrate that the Merger was effectuated by the co-CEOs of both companies, one of whom was also a controlling shareholder, and *not* through the Special Committee, which would communicate to shareholders that the Merger was driven by interests other than their own.  Put another way, the greater number of early Hatsopoulos-Locke meetings would cut against the inference of an independent Special Committee, fully empowered and willing to stand up to controlling corporate insiders.

The Proxy also failed to disclose whether Cassel previously provided financial advisory services to Tecogen or ADGE prior to its engagement.  ¶ 111(f).  Defendants assert they did not need to mention the sought information.  Mot. at 25.  However, a board's duty "to disclose potential conflicts of interest of its financial advisors so that stockholders [can] decide for themselves what weight to place on a conflict faced the financial advisor . . . cannot be disputed." *Saba*, 2017 Del. Ch. LEXIS 52, at *33.[12]  Defendants do not deny that such a prior relationship existed—which is unsurprising, as management often chooses advisors based on prior professional relationships— nor do they contest that such a prior relationship would create a conflict of interest.  Instead they argue that Plaintiff's disclosure allegation is speculative.  Mot. at 25.  However, one of Defendants' own cited cases demonstrates why this argument is baseless.  *See Calleros v. FSI Int'l, Inc.,* 892 F. Supp. 2d 1163 (D. Minn. 2012).  There, the proxy noted that the financial advisor had "not performed work" for the companies at issue in the past.  *Id.* at 32 n.12.  This is precisely what Defendants did *not* disclose here.  *See Saba,* at n.72, discussed *supra.*  Indeed, "[t]he prospect that such work would have taken place in the past, and therefore caused Cassel to be conflicted, is strengthened by the close business, management, and ownership ties between ADGE and Tecogen." ¶ 111(f).

### 2.    Material Omissions Concerning Cassel's Analyses

Shareholders are entitled to disclosure of the inputs used by financial advisors when

---

[12] *See also In re Atheros Commc'ns, Inc.,* No. CIV.A. 6124-VCN, 2011 WL 864928, at *8 (Del. Ch. Mar. 4, 2011) ("Because of the central role played by investment banks . . . this Court has required full disclosure of investment banker compensation and potential conflicts"); *Louisiana Mun. Police Employees' Ret. Sys. v. Crawford,* 918 A.2d 1172, 1190–91 (Del. Ch. 2007) (banker's financial incentives are "material to shareholder deliberations"); *David P. Simonetti Rollover IRA v. Margolis,* C.A. No. 3694-VCN,  2008 Del. Ch. LEXIS 78, at *25 (Del. Ch. June 27, 2008); *see also Wilson v. Great Am. Indus.,* 855 F.2d 987, 994 (2d Cir. 1988) ("The relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made."); *Kas v. Financial General Bankshares, Inc.,* 796 F.2d 508, 513 (D.C. Cir. 1986) ("potential impairment" of judgment must be disclosed).

performing their fairness opinions.  *See Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 871 (S.D. Ohio 2013) (denying motion to dismiss § 14(a) claim premised on omission of financial data necessary for shareholders "to assess the reliability of the DCF analysis as a measure of the Company's intrinsic value.").  "[O]ur law should not encourage needless prolixity, but that concern cannot reasonably apply to investment bankers' analyses, which usually address the most important issue to stockholders – the sufficiency of the consideration. . . ."  *In re Pure Res. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002). "The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result." *Id.*  "The valuation methods used to arrive at that *opinion as well as the key inputs and range of ultimate values generated* by those analyses must also be fairly disclosed."  *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203-204 (Del. Ch. 2007) (emphasis added).

Defendants claim they are "not required to disclose all inputs" and need only provide "a fair summary of the financial advisor's work." Mot. at 14.  The problem, however, is that the Proxy's recitation of Cassel's analyses does *not* constitute a fair summary.  It is well-settled that "misrepresentations as to the value of [a company] and nondisclosure of limitations on the information underlying [a] fairness opinion implicate matters at the heart of the decision confronting shareholders." *Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105, 1119 (D.R.I. 1990).  It is also well-settled that a DCF analysis is the preeminent valuation methodology for public companies.[13]  Here, the Proxy incompletely summarizes Cassel's DCF Analysis in a misleading fashion. Specifically, while the Proxy discloses the generic categories of financial

---

[13] *See, e.g., See Azar v. Blount Int'l, Inc.*, No. 3:16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493, at *15-16 (D. Or. Mar. 20, 2017) ("Numerous cases discuss the importance of financial projections and cash flow analyses to shareholders…); Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1575 (Aug. 2006) ("the most important analysis is, absent unusual circumstances, the discounted cash flow calculus.").

inputs Cassel's DCF relied upon (those categories are the projections and "the ADGE NOLs, the ADGE Estimated NOL Tax Savings and a discounted cash flow analysis of Tecogen Projections, the Tecogen NOLs, the Tecogen Estimated NOL Tax Savings and the Ultratek Pricing Information," Proxy at 69), the Proxy (i) only discloses an incomplete summary of the projections Cassel relied on, and (ii) fails to disclose *any* information about the other financial inputs (defined in the Complaint as the "Omitted Financial Inputs").  *Id.* (quoting the inputs that Cassel used, but not disclosing those very inputs); ¶ 104-106.

The Omitted Financial Inputs were necessary for shareholders to understand the DCF analysis.  *See, e.g. Fairness Opinions*, 55 Am. U.L. Rev. at 1577-78 (referenced at ¶¶108-110, and explaining the difficulty of making sense of opinions unless "full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices.")  At the very least, this is not an "extreme case" where the omitted information can be deemed "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality."  *See supra* p. 8.  Indeed, many courts have denied motions to dismiss § 14(a) claims premised on similar omissions.[14]

Contrary to Defendants' claim that these omissions do not render the Proxy misleading,

---

[14] *See, e.g. Smith*, 969 F. Supp. 2d at 871; *Dowling*, 735 F. Supp. at 1110 (denying motion to dismiss § 14(a) claim where plaintiff alleged "the purchase price was not a fair one and the shareholders were unable to recognize its inadequacy because the proxy statement omitted and misrepresented a number of facts material to an accurate determination of value."); *Biver v. Nicholas Financial, Inc.*, No. 8:14-cv-250-T-33TGW, 2014 U.S. Dist. LEXIS 73933, at *13 (M.D. Fla. May 30, 2014) (denying motion to dismiss § 14(a) claim where plaintiff alleged "Janney's two relative valuation analyses and equity discounted cash flow analysis in a manner that fails to provide shareholders with sufficient information to make an informed decision, thus omitting material facts necessary in order to make the statements therein not false or misleading."); *Azar*, U.S. Dist. LEXIS 39493, at *15-16 (denying motion to dismiss § 14(a) claim premised on omitted projections underlying DCF analysis); *City of St. Clair Shores Gen. Emples. Ret. Sys. v. Inland West Retail Real Estate Trust, Inc*., 635 F. Supp. 2d 783, 794 (N.D. Ill. 2009) (denying motion to dismiss § 14(a) claim where plaintiff alleged "the Fairness Opinion relied on faulty information without independent verification, omitted material facts, was devoid of credibility and reliability, and was fundamentally misleading.").

the bare-boned and defective disclosure of Cassel's analyses refutes its ultimate fairness conclusion, rendering Defendants' representation of the Merger as "fair," *see, e.g.,* Proxy at 61 (representing that Board determined Merger was "fair" and in "best interest" of shareholders based on Cassel's advice), as well the summary of Cassel's DCF Analysis *itself (id.* at 69-70), including the implied exchange ratio reference range, to be affirmatively misleading. ¶¶ 102, 104-106. Nearly identical allegations have been deemed sufficient at the motion to dismiss stage.[15]

Additionally, it is well settled that statements that a merger is "fair" to shareholders are actionable under § 14(a) where plaintiffs allege "they are both objective and subjectively false."[16] "A fairness opinion is objectively false if the subject matter of the opinion is not, in fact, fair, and is subjectively false if the speaker does not, in fact, believe the subject matter of the opinion to be fair." *JPMorgan*, 2007 U.S. Dist. LEXIS 93877 at *31-32.

Here, Plaintiff has set forth sufficient facts indicating that Defendants represented that the Merger Consideration was fair to ADGE shareholders,[17] despite that it was not. It is plain that Scarsdale's DCF analysis, which did not utilize the Omitted Financial Inputs, resulted in a range of estimated equity values per ADGE share of $0.38 to $0.51 per share, *entirely above the value of the Merger Consideration*. ¶¶ 85, 105; *see also* ¶ 12. Plaintiff also alleges that Defendants

---

[15] *E.g., Smith*, 969 F. Supp. 2d at 872-74 (denying motion to dismiss § 14(a) claim premised upon misleading Share Price Ranges); *Biver*, 2014 U.S. Dist. LEXIS 73933 at *13 (denying motion to dismiss § 14(a) claim premised upon misleading valuation summaries); *City of St. Clair Shores Gen. Emples. Ret. Sys.* 635 F. Supp. 2d at 794 (same where plaintiff alleged fairness opinion was misleading because it was based on flawed inputs).

[16] *In re JPMorgan Chase & Co. Sec. Litig.*, MDL No. 1783, 2007 U.S. Dist. LEXIS 93877, at *31 (N.D. Ill. Dec. 18, 2007) (citing *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1095 (1991)); *City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Estate Trust, Inc.*, 635 F. Supp. 2d 783, 793 (N.D. Ill. 2009) (same); *In re Trump Hotels Shareholder Derivative Litig.*, No. 96 Civ. 7820 (DAB), 2000 U.S. Dist. LEXIS 13550, at *48 (S.D.N.Y. Sept. 21, 2000) (same).

[17] The Proxy states that Defendants "determined and declared that the Merger and the other transactions contemplated by the Merger are advisable, fair to and in the best interest of ADGE" eight times. Proxy 1, 4, 49, 55, 56, 59, 61.

knew or should have known that Cassel's valuations were unreasonably low because it applied unreasonably low multiples and failed to account for synergies that it should have accounted for. ¶¶ 87-90. In other words, Plaintiff alleges that Cassel's valuation analyses were based on inappropriate and unreasonable inputs. Plaintiff further alleges that the Merger Consideration was unfair in light of the Company's recent financial performance and strategic initiatives and the inequitable asset contribution to ownership ratio. ¶¶ 13-14, 83-84, 91-98. These allegations sufficiently plead falsity with respect to statements that the Merger Consideration was "fair" to ADGE shareholders. *See JPMorgan*, 2007 U.S. Dist. LEXIS 93877, at *32; *Inland Western Retail*, 635 F. Supp. 2d at 793-794.

### 3. Material Omissions Concerning ADGE's UCL

The Complaint alleges that the Proxy failed to disclose the length of the contracts resulting in ADGE's $8.862 million in Unfavorable Contract Liability, and explains that this information is material, because "if the unfavorable contracts were to expire in a relatively short amount of time, then ADGE's stockholders would have been able to consider this fact when determining whether to either vote in favor of the Merger before the expiration, or to wait until after the expiration to approve any merger transaction. . . ." ¶ 107(h). Defendants assert that "the data concerning the UCL were disclosed," Mot. at 17, which is untrue. The Proxy merely disclosed the value of the UCL, which begs the question as to when this liability would become extinguished. To analogize, it would be misleading for a proxy, recommending a transaction to raise cash, to disclose a $50 million debt without *also* disclosing the fact that the debt could only be called due 10 years into the future, as the date the debt is due is obviously relevant as to whether the company's cash flow is sufficiently limited so as to necessitate the transaction. *Cf. Saba*, 2017 Del. Ch. LEXIS 52, at *36-37 (sought information concerning restatement of financials was material, as without it, shareholders had "no means to evaluate the choice they were being asked to make," specifically,

either "accept merger consideration" now, or "stay the course" and hope for better future outcomes).[18] Here too, the date the liability extinguished was crucial.

### 4.  Plaintiff's Complaint Does Not Immunize Defendants' Conduct

Defendants cynically point to the Complaint's well-pleaded allegations concerning the Merger's unfairness as evidence that "shareholders had sufficient information to decide whether to vote for or against the merger."  Mot. at 19.  However, Plaintiff's and his counsel's diligence in investigating this Transaction (without the benefit of discovery) cannot be used to immunize corporate fiduciaries from duty to comply with securities law.  ADGE shareholders should not be compelled to hire lawyers to unearth that they are being misled.[19] That Defendants have now been called out for their misleading statements does not make those statements any less misleading. Defendants' circular argument would essentially eviscerate all § 14(a) claims at the pleading stage.

### C.  Plaintiff Has Successfully Pled § 20(a) Claims

"The elements of § 20(a) are generally stated to be (i) an underlying violation of the same chapter of the securities laws by the controlled entity. . . ; and (ii) control of the primary violator by the defendant." *Brody v. Stone & Webster, Inc.*, 414 F.3d 187, 194 (1st Cir. 2005).  Plaintiff

---

[18] Defendants also claim that, even if they should have disclosed material information regarding Cassel's financial analyses, the omission of such information did not render any statements in the Proxy misleading. Mot. at 18.  Because Defendants chose to discuss the UCL in the first place, absent full disclosure, that discussion is misleading to shareholders.  Once the Proxy disclosed the value of UCL, i.e., it went "down the road of partial disclosure," *Saba*, 2017 Del. Ch. LEXIS 52, at *36, n.71, it could not remain silent as to the expiration issue.  *See also Malone v. Brincat*, 722 A.2d 5, 12 n.31 (Del. 1998).

[19] *See St. Louis Police Ret. Sys. v. Severson*, Case No.: 12-CV-5086 YGR, 2012 U.S. Dist. LEXIS 152392, at *12 (N.D. Cal. Oct. 23, 2012) (proxy "should inform, not challenge the reader's critical wits. That an investor could hypothetically conduct research to clarify ambiguities and discover omissions in the proxy statement does not relieve the Board of its obligations under Rule 240.14a-9. Shareholders are entitled to a candid disclosure of all material facts and should not be required to ask a series of detailed questions to elicit the material fact."); *see also 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 230 (5th Cir. 1994) (§14(a) is designed "to protect the voting process as a whole" and thus stockholder is not required to show he relied on challenged statement ); *Pavlidis*, 737 F.2d at 1232 ("[I]t is clear that a court may base § 14(a) liability on the fact that material information is disclosed piecemeal or buried in the footnotes to financial statements.").

respectfully submits that it has pleaded that the Proxy disseminated by the controlled entity (ADGE) violated § 14(a), *see supra* Section III.B., thereby establishing a predicate securities violation. Regarding the second element, Defendants claim that the Complaint fails to allege that they exercised actual control over the Company. Mot. at 28. This is untrue. Certainly, Plaintiff alleged that the Hatsopoulos brothers, as controlling shareholders, asserted actual control over ADGE. *See supra* pp. 2-3. John Hatsopoulos and Locke also signed the letter to ADGE shareholders in the Proxy recommending the Merger. *See* Dkt. 43-3, at 4. As for the other Defendants, Defendants argue that "mere status as an officer or director is not enough." Mot. at 28. However, their cited case (in which the court sustained § 20(a) claims against several defendants), does not support this proposition, as it noted that directors who "sign off" on disclosures are presumed to "control" the corporation. *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 222 (S.D.N.Y. 1999). Here, the Complaint has alleged that degree of control.[20]

Defendants also concede that the First Circuit has not adopted the "culpable participation" standard for § 20(a) claims. Mot. at 28, n. 81; *id.* at 29, n.82. *Cf. Brody,* 414 F.3d at 194, 196 n. 6 (unlike Rule 10b-5, a plaintiff asserting § 20(a) violations need not "plead or prove scienter (or any other state of mind) on the part of the controlling persons. . . ."). And courts within jurisdictions that identify culpable participation as an element of a § 20(a) claim hold that a plaintiff need only plead a primary violation and control, as it is the defendant's burden to disprove culpability by "show[ing] that he acted in good faith, and that he did not induce . . . the violation." *See, e.g., In re Parmalat Sec. Litig.,* 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005). In any event,

---

[20] *See, e.g.* ¶ 128 (Director/Officer Defendants were provided with copies of Proxy, and had ability to prevent the issuance of the misleading statement, or to cause the statements to be corrected); ¶ 129 (Defendants undertook direct and supervisory involvement in the day-to-day operations of ADGE); *id.* (Proxy contained the unanimous recommendation of each Director/Officer Defendant to approve the Merger); ¶ 130 (Defendants participated in the drafting of descriptions concerning the Merger negotiations).

Plaintiff adequately alleged that Defendants actually participated in the violation.  *See supra*, n.21.

Accordingly, Plaintiff has sufficiently alleged federal disclosure claims.[21]

### D.     The Court Undoubtedly Has Diversity Jurisdiction

Defendants claim that Plaintiff has not established diversity because "it has not alleged the citizenship of Vardakas," whom they assert is a "named plaintiff."  Mot. at 30.  Defendants are wrong.  Vardakas is not a plaintiff, and is not identified as a party in the Complaint.  While Vardakas did initially file a complaint concerning the Merger, he did not seek to be appointed Lead Plaintiff under the PSLRA, nor did he (nor could he) file an amended pleading. Therefore, aside from his interests as a potential unnamed class member, Vardakas has no involvement in this Action at all; just as Cassel, whom Vardakas had sued, but whom Plaintiff has declined to sue, has no involvement in this Action at all.

"It is clear beyond hope of contradiction" that a party may amend its complaint, and that once filed, that complaint "normally supersedes the antecedent complaint. Thereafter, the earlier complaint is a dead letter and no longer performs any function in the case."  *ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 91 (1st Cir. 2008).  Accordingly, "courts look to the amended complaint to determine jurisdiction." *Id.* (*quoting Rockwell International Corp. v. United States*, 549 U.S. 457 (2007)).  For example, a plaintiff may amend her complaint and drop a previously sued non-diverse defendant so as to create diversity.  *See, e.g., Toland v. Margulies*, 93cv3549(MBM), 1993 U.S. Dist. LEXIS 16148, at *4-8 (S.D.N.Y. Nov. 10, 1993).  Conversely, diversity jurisdiction previously established will be lost upon amending a complaint to sue a non-diverse defendant, as the amended complaint is "the operative complaint for purposes of determining jurisdiction. . . . ."

---

[21] Plaintiff does not oppose Defendants' request to dismiss without prejudice the § 14(a) claim as against George Hatsopoulos. Mot. at 25.  To the extent discovery shows that George Hatsopoulos was involved in preparing the Proxy, Plaintiff reserves the right to amend its pleading accordingly.

*See, e.g., Ross v. Sam's E., Inc.,* No. 8:06-cv-887-T-26EAJ, 2006 U.S. Dist. LEXIS 38838, at *2 (M.D. Fla. June 12, 2006).  Defendants ignore this uncontroversial principle, and instead cite to cases that simply recite the general standards governing diversity (Mot. at 30), none with facts remotely similar to those that occurred here.

To the extent Defendants' form-over-substance argument is premised on this Action's now anachronistic caption (which reflects the parties named in Vardakas's pleading) this Court possesses *sua sponte* authority to order that the caption be amended to reflect existing reality.  *See, e.g., Cadogan v. Warren*, No. : 08-CV-13456-DT, 2009 U.S. Dist. LEXIS 14157, at *4 (E.D. Mich. Feb. 24, 2009).  While not necessary, amending the caption would certainly be a more prudent and efficient course than Defendants' preferred method, which would be dismissal, whereupon Plaintiff would simply refile this Action under a different caption and (again) establish diversity.[22]

### E.    The Court Should Retain Supplemental Jurisdiction over the State Law Claims

As Plaintiff has explained, the Complaint properly states federal claims arising from the defective Proxy recommending the Merger.  If the Court agrees, and sustains any federal claims, then it must exercise supplemental jurisdiction over the inextricably intertwined breach of fiduciary duty claims arising from the Merger, which was unfair, both in price and process.[23] However, even if the Court were to dismiss all federal claims, *and* conclude that diversity is somehow wanting, it should still exercise its discretion to retain supplemental jurisdiction over the state law claims.  *See, e.g., Bonazoli v. R.S.V.P. Int'l, Inc.,* 353 F. Supp. 2d 218, 230 (D.R.I.

---

[22] Defendants acknowledge, by footnote, that they are not challenging jurisdiction under the Class Action Fairness Act or for want of sufficient "amount in controversy."  Mot. at 30, n.85.

[23] *Audette v. Carrillo*, C.A. No. 15-cv-13280-ADB, 2017 U.S. Dist. LEXIS 37962, at *8 (D. Mass. Mar. 16, 2017) (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256 (1st Cir. 1996) ("A federal court exercising jurisdiction over an asserted federal-question claim must also exercise supplemental jurisdiction over asserted state-law claims that arise from the same nucleus of operative facts")).

2005) (court retained jurisdiction, even when federal claims were eliminated).  When federal claims are dismissed, a court should consider "interests of fairness, judicial economy, convenience, and comity." *Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998); *New Rock Asset Partners, L.P. v. Preferred Entity Advancements*, 101 F.3d 1492, 1505 (3d Cir. 1996) ("elimination of the federal claim does not deprive the court of the constitutional power to adjudicate the pendent claim").

Certainly, judicial economy and fairness counsel for retaining jurisdiction over the state claims, when Plaintiff stipulated with Defendants to dismiss his state action, and, as Lead Plaintiff under the PSLRA, has filed an Amended Class Action Complaint.  Further delay would only prejudice Plaintiff and the putative Class.  *See, e.g., Grogan v. O'Neil*, 292 F. Supp. 2d 1282, 1288 (D. Kan. 2003) (retaining supplemental jurisdiction over shareholder class action "even if diversity jurisdiction would otherwise not exist").

## IV.      CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated: August 18, 2017                           Respectfully submitted,

*/s/ Nathaniel L. Orenstein*
Norman Berman (BBO 040460)
Nathaniel L. Orenstein (BBO 664513)
**BERMAN TABACCO**
One Liberty Square
Boston, MA  02109
Tel:  617-542-8300
Fax:  617-542-1194
Email:  nberman@bermantabacco.com
            norenstein@bermantabacco.com

Jason M. Leviton (BBO 678331)
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 400
Boston, MA 02110
Tel: (617) 398-5600
Fax: (617) 507-6020
Email:  jason@blockesq.com

*Co-Liaison Counsel*

**WOLF POPPER LLP**
Carl L. Stine
Robert S. Plosky
Adam J. Blander
845 Third Avenue
New York, New York 10022
Tel:  212-759-4600
Fax:  212-486-2093
Email: cstine@wolfpopper.com
rplosky@wolfpopper.com
ablander@wolfpopper.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com

*Attorneys for Lead Plaintiff and Co-Lead Counsel*

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA  19004
Tel:  (610) 667-6200
E-mail:esmith@brodskysmith.com
        mackerman@brodskysmith.com

*Additional Attorneys for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I, Nathaniel L. Orenstein, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 18, 2017.

/s/ *Nathaniel L. Orenstein*
Nathaniel L. Orenstein