UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LEE VARDAKAS, individually and on behalf of all others similarly situated, ) ) ) ) | | |
| Plaintiff, ) ) ) | | |
| v. ) ) ) | Civil No. 17-10247-LTS | |
| AMERICAN DG ENERGY INC., JOHN N. HATSOPOULOS, GEORGE N. HATSOPOULOS, et al., ) ) ) ) ) | | |
| Defendants. ) ) | | |

ORDER ON MOTION FOR JUDGMENT

November 16, 2018

SOROKIN, J.

This class action case, brought by and on behalf of William Chase May[1] and other similarly situated holders ("the May class") of the common stock of American DG Energy Inc. ("American DG"), arises out of the 2017 merger of American DG and Tecogen Inc. ("Tecogen"). Doc. No. 34. The case essentially alleges that the merger of American DG and Tecogen ("the merger") was the result of a conflicted sales process that undervalued the common stock of American DG. See id. On March 2, 2018, the Court dismissed May's federal securities law claims. Doc. No. 55. Remaining are Counts III, IV, and V, which allege that the directors,

---

[1] The class action was originally brought by Lee Vardakas. Doc. No. 1. Vardakas and May moved to appoint May as Lead Plaintiff, and thereafter the Court appointed May to be Lead Plaintiff. Doc. Nos. 18, 25. On June 19, 2017, May filed an amended class action complaint ("the Complaint"), identifying May as the lead plaintiff. Doc. No. 34. Vardakas remains the named plaintiff in the action though May is the lead Plaintiff. See Doc. No. 34.

co-CEOs, and certain controlling shareholders of American DG and Tecogen[2] breached their fiduciary duties in connection with the merger (Counts III and IV); and that George Hatsopoulos, former American DG chairperson and Tecogen director, and certain entities[3] aided and abetted in that breach (Count V). Doc. No. 34 ¶¶ 134–45. Now, the defendants have moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure as to all remaining counts. Doc. No. 71. Plaintiffs have opposed. Doc. No. 77.

I.  FACTS[4]

American DG and Tecogen are energy companies with complementary businesses. American DG distributes and operates on-site combined heat and power systems and natural gas powered cooling systems. Doc. No. 34 ¶ 24. Tecogen designs, manufactures, and sells combined heat and power systems. Id. ¶¶ 25, 50. Prior to the merger, the companies were "affiliated," id.

---

[2] The individual defendants are Co-CEOs of American DG and Tecogen John N. Hatsopoulos and Benjamin Locke ("officer defendants"); board of director members Charles T. Maxwell, Deanna M. Petersen, Christine Klaskin, John Rowe, Joan Giacinti, Elias Samaras ("director defendants"); and George N. Hatsopoulos. See Doc. No. 34 ¶¶ 24–39.

[3] The entity defendants initially named in the Complaint are American DG, Tecogen, and Tecogen.ADGE Acquisition Corp. ("Merger Sub"), and Cassel Salpeter & Co., LLC ("Cassel"). All claims against American DG and Cassel have been dismissed. See Doc. No. 55. Accordingly, the only remaining entity defendants are Tecogen and Merger Sub. See Doc. No. 34 ¶¶ 142–145.

[4] In considering the defendants' motion, the Court must accept the Complaint's factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. Unless otherwise noted, all facts are recited as set forth in the Complaint. The defendants' motion is accompanied by exhibits, including SEC filings, American DG's certificate of incorporation, and American DG and Tecogen's joint proxy statement. See Doc. Nos. 73; 73-3; 73-4; 73-5; 73-6; 73-7. While ordinarily "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden . . . courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; [and] for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). SEC filings and risk disclosures are the sorts of documents courts routinely consider at this stage. See, e.g., Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 232 n.2 (1st Cir. 2015). Plaintiff has not objected to the consideration of these documents. Accordingly, the Court will consider the submitted exhibits where indicated.

2

¶ 47; they shared co-founders, brothers John Hatsopoulos ("J. Hatsopoulos") and George Hatsopoulos ("G. Hatsopoulos"); co-CEOs, John Hatsopoulos and Benjamin Locke; certain members of senior management, directors, and ownership; and office space. Id. ¶¶ 3, 27–28, 50. In 2014 and 2015, nearly 10 percent of Tecogen's total revenues came from sales of cogeneration parts and services to American DG. Id. ¶ 49.

In July 2010, American DG established EuroSite Power ("EuroSite"), a subsidiary of American DG. Id. ¶ 72. As was the case with American DG and Tecogen, the leadership and ownership of American DG and EuroSite overlapped. Id. ¶¶ 72–73. Between 2011 and 2012, American DG issued convertible debentures to J. Hatsopoulos and two other owners of Tecogen common stock in an amount of $19.4 million, which remained outstanding until early 2016. Id. ¶ 75.

Discussions of a merger between the two companies began in early 2016. Id. ¶ 63. The initial discussions took place informally and included J. Hatsopoulos, Benjamin Locke, and outside counsel for both companies, as well as the management teams of both companies. Id. ¶¶ 63–64. These initial meetings were not disclosed to either company's board of directors at the time that the meetings were ongoing. Id. In March 2016, J. Hatsopoulos and Locke informed the board of directors of each company of the merger discussions, leading each board to create a committee of independent directors to negotiate the merger. Id. ¶ 65. The committees were solely tasked with evaluating the Tecogen-American DG merger and did not run a competitive auction or otherwise explore other potential acquirors. Id. ¶ 68. During the first month after its formation, the American DG committee discussed on several occasions a transaction that would eliminate the American DG convertible debt. Id. ¶ 77. On April 25, 2016, following these discussions, the board of American DG approved a transaction in which the convertible debt of American DG

was exchanged for shares of EuroSite with an exchange price of $0.575 per share of EuroSite stock used to calculate the number of EuroSite shares exchanged for the convertible debt. Id. ¶ 77-78. (At the time, the market price per share of EuroSite was $0.75 per share. Id. ¶ 78.)

The American DG and Tecogen independent committees continued to meet discuss, evaluate, and negotiate the merger of American DG and Tecogen until October 31, 2016 when a merger agreement was negotiated. See Doc. No. 73-3 at 102–109. The agreement reflected the committees ultimately negotiated purchase price of $0.38 per share of Tecogen, which the parties settle upon after discussing prices ranging from $0.29 to $0.41 per share. Id. Each committee of independent directors recommended the merger to their respective boards of directors. Id. at 108–09. Following these recommendations, each company's board of directors unanimously approved the merger. Id. at 109–10. On November 1, 2016, the agreement of merger was executed by American DG and Tecogen, and, on November 2, 2016, American DG and Tecogen announced their plan of merger, upon the consummation of which Merger Sub, a wholly owned subsidiary of Tecogen formed for the purpose of effecting the merger, merged with and into American DG, with American DG continuing as the surviving corporation as a wholly owned subsidiary of Tecogen. See Doc. No. 34 ¶ 2; 73-3 at 2.

At the time the merger was announced, co-founders J. and G. Hatsopoulos each had leadership roles in the companies. J. Hatsopoulos was the co-CEO of both companies and served as director of each, while G. Hatsopoulos was a technical advisor to American DG and had previously served as chairperson of the board of directors for American DG and on the board of directors for Tecogen. Doc. No. 34 ¶ 4. The two brothers, together with their families, also beneficially owned or controlled more than 34 percent of American DG stock and more than 23 percent of Tecogen common stock. Id. ¶ 5. As of March 9, 2017, the Hatsopoulos brothers

4

collectively held 17.4 million shares of American DG common stock and 4.6 million shares of Tecogen common stock. Id. ¶ 51. By virtue of their ownership interests in American DG and Tecogen, the brothers, "with a small group of other major shareholders, ha[d] the ability to control various corporate decisions, including [the two companies'] direction and policies, the election of directors, the content of [the] charter and bylaws and the outcome of any other matter requiring shareholders' approval, including a merger." Id. ¶¶ 54–55.

The proxy statement issued to shareholders described the merger agreement negotiation process and the two companies' overlapping leadership and ownership. See Doc. No. 73-3 at 101–09, 112. Stockholders overwhelmingly voted in favor of the merger, and, on May 18, 2017, the merger was executed. Doc. No. 73-4.

## II. LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure provides, "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)." Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007). To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff[]." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). "[F]actual allegations" must be separated from "conclusory statements in order to analyze whether the former, if taken as true, set forth a plausible, not merely a conceivable, case for

relief." Juarez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 276 (1st Cir. 2013) (internal quotations omitted). This highly deferential standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005) (quoting Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997)).

III. DISCUSSION

    A. Breach of Fiduciary Duty against J. and G. Hatsopoulos in Their Capacity as Control Group

Count IV alleges that J. and. G. Hatsopolous breached their common-law "fiduciary duties of loyalty, care, and good faith owed to [American DG's] unaffiliated shareholders by placing their personal interests ahead of the interests of" May and similarly situated shareholders "and foisting an unfair transaction, both in terms of process and price" on them. Doc. No. 34 ¶ 139. "Because they acted in concert as a control group and stood on both sides of the [m]erger," May claims that they "have the burden . . . of proving that the transaction was entirely fair" to May and similarly situated shareholders. Id. ¶ 138.

The parties agree Delaware law applies to May's common-law claims. Under Delaware law, "a number of shareholders . . . can collectively form a control group" that can be "accorded controlling shareholder status, and, therefore, its members owe fiduciary duties to their fellow shareholders." Dubroff v. Wren Holdings, LLC, 2009 Del. Ch. LEXIS 89, *12. "A controlling or

6

dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness." Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110, 1115 (Del. 1994). However, controlling shareholders' "undermining influence does not exist in every controlled merger setting, regardless of the circumstances." Kahn v. M & F Worldwide Corp., 88 A.3d 635, 644 (Del. 2014). When a controlling shareholder and minority shareholders receive equal treatment in a merger, "the presumption is that a large blockholder, who decides to take the same price as everyone else, believes that the sale is attractive, and thus is a strong indication of fairness and that judicial deference is due." In re Morton's Rest. Grp., Inc. S'holders Litig., 74 A.3d 656, 666 (Del. Ch. 2013). But even "[t]he equal-treatment principle is not an absolute rule because there may be times when a controller has a unique interest that causes it to favor a transaction that is disadvantageous, or relatively less advantageous, for the minority," such as an urgent need for liquidity. Ford v. VMware, Inc., 2017 Del. Ch. LEXIS 70, *43 (Del. Ch. May 2, 2017).

In this case, May alleges that the Hatsopolous brothers acted as a control group of American DG, Doc. No. 34 ¶¶ 46, 138, and that evaluating their alleged breach of fiduciary duty in their capacity as a control group consequently requires application of the entire fairness standard, id. ¶¶ 7, 46, 61, 138. At the November 2, 2018, hearing, counsel for the defendants conceded that the Hatsopolous brothers acted as a control group in both companies involved in the merger transaction. The defendants argue that the facts of this case nevertheless do not require the application of the equal fairness standard.

The parties agree that, if the equal fairness standard applies, the claim against the Hatsopolous brothers must survive at least to summary judgment, while the application of the business judgment rule would lead to the claim's dismissal at this stage. May argues that

7

Delaware law is clear that the equal fairness standard applies in any case where a controlling shareholder is on both sides of the merger, advancing cases that include dicta appearing to so hold. See, e.g., Emerald Partners v. Berlin, 726 A.2d 1215, 1221 n.8 (Del. 1999) (controlling shareholder's "stance on both sides as a corporate fiduciary, alone, is sufficient to require the demonstration of entire fairness"). But in every such case, the controlling shareholder had an identifiable interest diverging from those of the shareholder plaintiff, and May's counsel conceded at the November 2, 2018, hearing that he could identify no controlling Delaware case specifically holding that application of the equal fairness standard is required even without such a conflict of interest.[5] When federal courts are applying state law, they must "interpret[] and apply[] the rules of substantive law enunciated by the state's highest judicial authority, or, on questions to which that tribunal has not responded, mak[e] an informed prophecy of what the court would do in the same situation." Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996). Whether the equal fairness standard is the proper standard of review in a case with these facts appears to be an open question that requires such a prediction.

May offers no factual allegations to establish that the Hatsopolous brothers had interests that conflicted with minority shareholders, much less that they engaged in self-dealing with respect to the merger terms. Relying on the Hatsopolous brothers' position as controlling shareholders on both sides of the merger alone to justify the application of the equal fairness standard suffers from at least three problems. First, the brothers received the same terms as other

---

[5] May advances several cases in which such an identifiable interest was present, and it is clear that there exist many scenarios in which the controlling shareholder would have such an interest. Most basically, for example, such an interest could be present if, unlike here, the claim were brought by a shareholder of the company in which the controlling shareholder held a share that was *smaller*, rather than larger, than her share of the other company. The Court further notes that the defendants' counsel also conceded that there is no controlling case with the opposite holding.

8

shareholders, accepting the 0.092 ratio used to exchange each share of American DG common stock for Tecogen common stock. Doc. No. 34 ¶ 1. Second, although May claims that the greater value of the Hatsopolous brothers' holdings in Tecogen, compared to their American DG holdings, gave them "a huge financial incentive to protect the value of their Tecogen shares in the Merger, even at the expense of the value of their [American DG] shares," id. ¶ 52, the opposite is true. As the defendants argue, because the brothers owned a greater proportion of American DG's total outstanding common stock than they did of Tecogen's, their financial incentive ran in the opposite direction: They stood to benefit from a higher purchase price, not a lower one. See Doc. No. 72 at 21–22. Finally, although May claims that the Hatsopolous brothers interfered with the ability of the independent committee tasked with negotiating the merger to act in the best interest of shareholders, the independent committee nevertheless secured a 27 percent increase in Tecogen's offered purchase price, from $0.30 per American DG share to $0.38 per share. Doc. No. 73-3 at 106–08. Simply put, the defendants do not advance a plausible reason other than price—such as an urgent need for liquidity, a particularized benefit to the brothers, or anything else—for which the brothers' interests would have diverged from those of other shareholders. The Hatsopolous brothers' involvement, as described in the Complaint, therefore does not create a rational inference that their interests diverged from those of minority American DG shareholders.

The Court concludes that the Delaware Supreme Court, presented with facts such as these, would rule that the application of the equal fairness standard is not required in cases where a controlling shareholder stands on both sides of a merger but lacks any plausible conflict of interest with the shareholder advancing the lawsuit. The purpose of the equal fairness standard is to provide a more searching judicial inquiry in cases where the controlling shareholder's interests

9

diverged from those of the aggrieved minority shareholder, who therefore requires additional protection. See Kahn, 638 A.2d at 1116. The Delaware court has discussed several categories of mergers in which these interests diverge by definition, including a "self-dealing" buyout of a subsidiary by its majority-shareholder parent company, Glassman v. Unocal Expl. Corp., 777 A.2d 242, 247 (Del. 2001); a majority-shareholder's "interested" merger of a company with other companies he owns entirely, Emerald Partners v. Berlin, 787 A.2d 85, 93 (Del. 2001); a controlling partnership's "self interest[ed]" purchase of the company's sole asset for its own tax planning needs, William Penn P'ship v. Saliba, 13 A.3d 749, 756 (Del. 2011); and a controlling shareholder's "self-interested" purchase of the remaining shares of a public corporation, In re Cornerstone Therapeutics Inc. Stockholder Litig., 115 A.3d 1173, 1177 (Del. 2015). In any of these circumstances, the conflict of interest between the controlling and minority shareholders is clear from the facts pled, making apparent minority shareholders' need for additional protection from the power of the controller.

Without such divergent interests, the minority shareholder stands in the same shoes as shareholders suing corporate directors to complain about merger terms, a circumstance in which the business judgment rule would generally apply. See, e.g., Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993). In a case governed by the entire fairness standard, "even though the ultimate burden of proof is on the majority shareholder to show by a preponderance of the evidence that the transaction is fair, it is first the burden of the plaintiff attacking the merger to demonstrate some basis for invoking the fairness obligation." Weinberger v. UOP, Inc., 457 A.2d 701, 703 (Del. 1983). Although a conflict of interest between a control group on both sides of a merger and the minority shareholders of one of the companies often, if not usually, creates such a basis, the facts pled in this case do not establish such a conflict. Applying the entire

fairness standard in a case without some conflict of interest would place a court in the role of assessing, likely years after the fact, a merger's merits without any compelling justification—precisely the judicial meddling that the business judgment rule is intended to prevent. See Cede & Co., 634 A.2d at 360. Here, May has not met his burden to demonstrate a conflict of interest sufficient to merit such an inquiry.

Accordingly, because American DG's other shareholders need no protection from the Hatsopolous brothers' pursuit of interests shared by all shareholders, application of the entire fairness standard serves no purpose here. Because May offers no factual basis to infer that the Hatsopolous brothers' interests diverged from those of American DG's minority shareholders, there is no reason to infer that the brothers did not share minority shareholders' interest in a higher purchase price, unlike in the cases advanced by May. The Court therefore finds that that the business judgment rule, rather than the entire fairness standard, applies to the Hatsopolous brothers' conduct in this case. May's counsel conceded at the November 2, 2018, hearing that the Complaint does not state a claim with respect to the merger negotiations under the business judgment standard.[6]

May's claims about the transaction in which the convertible debt of American DG was exchanged for shares of EuroSite also fail. Although May claims that J. Hatsopolous "cause[d

---

[6] After the defendants moved for judgment on the pleadings on May 21, 2018, the parties moved jointly to allow May extra time to file his opposition to that motion, which was submitted on June 12, 2018. The opposition argues solely that the Complaint states a claim because the equal fairness standard applies. Nowhere does it argue that, in the alternative, another standard of review might apply, and May made no request to file a surreply. At the end of the lengthy oral argument at the November 2, 2018, hearing, May's counsel suggested for the first time that intermediate scrutiny might apply even if the entire fairness standard is inapplicable and offered to provide supplemental briefing on that possibility. The time for May to raise this argument was in his opposition to the defendants' motion for judgment. Because May's opposition brief did not mention the possible applicability of intermediate scrutiny, the Court declines to consider the argument, deeming it waived.

American DG] to sell him[] a valuable asset for much less than its market value . . . potentially expos[ing] him and the other [American DG] directors to derivative liability," he also admits that such liability "would have been eliminated by the Merger." Doc. No. 34 ¶ 140; see also id. ¶ 81 (acknowledging that "derivative liability was likely extinguished through the Merger"). "Under Delaware law, it is well established that a merger which eliminates a derivative plaintiff's ownership of shares of the corporation for whose benefit she has sued terminates her standing to pursue those derivative claims." Lewis v. Ward, 852 A.2d 896, 900–01 (Del. 2004). Because, as a result of the merger, May is no longer a shareholder in American DG, he may no longer bring a derivative claim related to the convertible debt transaction. Accordingly, the defendants' motion for judgment on the pleading is ALLOWED as to Count IV against J. Hatsopolous and G. Hatsopolous in their role as a control group.

### B. Breach of Fiduciary Duty Against Director/Officer Defendants

Count III alleges the director and officer defendants breached their common-law fiduciary duties owed to American DG shareholders by "fail[ing] to take steps to obtain the highest available value for [American DG] consideration . . . fail[ing] to adequately consider other strategic alternatives, [and by] favor[ing] their own . . . interests . . . rather than protect the best interests of [American DG's] unaffiliated shareholders," Doc. No. 34 ¶ 135.

#### 1. *Director Defendants*

Under Delaware law, directors owe shareholders duties of due care, loyalty, and good faith. Emerald Partners, 787 A.2d at 90. However, American DG's certificate of incorporation contains an exculpatory provision limiting director liability to the fullest extent permitted under Delaware law. Doc. No. 73-7 at 3. Delaware law permits directors, through such clauses, to exculpate themselves from liability for breaches of the duty of due care. Del. Code tit. 8

§ 102(b)(7). Accordingly, as to the director defendants, May's claim is limited to breaches of loyalty and good faith.

Because the director defendants are protected by an exculpatory charter provision, May must plead "facts supporting a rational inference that the director[s] harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." In re Cornerstone Therapeutics Inc. Stockholder Litig., 115 A.3d at 1178–80. The Complaint makes only limited specific claims as to each of the director defendants Charles T. Maxwell, Deanna M. Petersen, Christine Klaskin, John Rowe, Joan Giacinti, and Elias Samaras. The Complaint explains each director's relevant roles: Maxwell's positions on the board of directors of American DG and Tecogen; Petersen, Klaskin, and Rowe's positions on the board of directors of American DG and membership in the independent committee formed to advise American DG; and Giacinti and Samaras' positions on the board of directors of American DG and Eurosite. Doc. No. 34 ¶¶ 29-34, 65, 73. The Complaint also alleges that Klaskin was added to the independent committee weeks after the other committee members were selected and weeks after the committee's formation. Id. ¶ 65.

The limited factual allegations in the Complaint as to the director defendants fail to support a rational inference that the directors were disloyal or acted in bad faith. May argues that he need not present specific facts as to each director because he has alleged that the directors were "beholden to the Hatsopoulos brothers," Doc. No. 77 at 15, but that conclusory allegation is unsupported by specific facts. May alleges the Hatsopoulos brothers attended meetings with the independent committee members, Doc. No. 34 ¶ 66, but their attendance does not, on its own, create a rational inference that the brothers improperly influenced the directors' decision-making

13

sufficient to overcome the presumption that the they acted independently. Plaintiff's comparison of this case to *MAZ Partners LP v. Shear*, 204 F. Supp. 3d 365 (D. Mass. 2016), is inapt because this case lacks the "unresolved questions concerning a director's independence," Doc. No. 77 at 20, that were present in *MAZ*. In that case, the directors voted to approve a $5 million payment to the CEO at other shareholders' expense without obtaining a fairness opinion from outside advisors, creating a rational inference that the CEO improperly influenced the directors' actions. *MAZ*, 204 F. Supp. 3d at 376. By contrast, the acquisition at issue here was negotiated by special committees of each board and recommended to the boards after evaluation, and the acquisition benefitted shareholders, including the brothers, in like manner. Accordingly, the defendants' motion for judgment on the pleadings is ALLOWED as to Count III against the director defendants.

2. *Officer Defendants*

Under Delaware law, "the fiduciary duties of officers are the same as those of directors." Gantler v. Stephens, 965 A.2d 695, 709 (Del. 2009). The officer defendants are John Locke and J. Hatsopoulos. With respect to Locke, the Complaint alleges only that he discussed the merger with J. Hatsopoulos before it was presented to the board, informed the board of that discussion, and attended the independent committee's meetings. Doc. No. 34 ¶¶ 8, 63, 65–66. These facts alone are insufficient to support a rational inference that Locke, who did not vote on the merger and received no special benefit from it, violated his fiduciary duty or otherwise acted wrongly with respect to the merger. Similarly, with respect to J. Hatsopolous in his capacity as officer, the Complaint relies on conclusory claims that J. Hatsopolous placed his own interests ahead of shareholders without alleging specific facts to support that inference. Id. ¶¶ 44–45, 135. There is no allegation that J. Hatsopolous received special benefit from the merger as a result of his

14

officer capacity. Accordingly, the defendants' motion for judgment on the pleading is ALLOWED as to Count III against Locke and against J. Hatsopolous in his capacity as officer.

C. Aiding and Abetting Breaches of Fiduciary Duty

Count V alleges that G. Hatsopolous, Tecogen, and Merger Sub "knowingly aided and abetted" the director and officer defendants' breach of their fiduciary duties. Doc. No. 34 ¶ 144. "An aiding and abetting claim 'may be summarily dismissed based upon the failure of the breach of fiduciary duty claims against the director defendants.'" In re KKR Fin. Holdings LLC S'holder Litig., 101 A.3d 980, 1003 (Del. Ch. 2014) (quoting Meyer v. Alco Health Servs. Corp., 1991 WL 5000, at *2 (Del. Ch. Jan. 17, 1991)). Because the primary claims of breach of fiduciary duty have failed, the aiding and abetting claims also fail. Accordingly, the defendants' motion for judgment on the pleading is ALLOWED as to Count V.

IV. CONCLUSION

Based on the foregoing, the defendants' Motion for Judgment on the Pleadings, Doc. No. 71, is ALLOWED as to the remaining Counts III, IV, and V. May's Motion for Class Certification, Doc. No. 85, is DENIED as moot. The Clerk shall enter judgment forthwith, with each side to bear its own fees and costs.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge